The PEOPLE of the State of
Colorado, Complainant,

v.

Israel GALINDO, Attorney–Respondent.

No. 94SA247.

Supreme Court of Colorado,
En Banc.

Oct. 17, 1994.

Linda Donnelly, Disciplinary Counsel, James C. Coyle, Asst. Disciplinary Counsel, Denver, for complainant.

Michael L. Bender, Denver, for attorney-respondent.

**PER CURIAM.**

A hearing panel of the Supreme Court Grievance Committee approved the findings of a hearing board and recommended that the respondent [1] be suspended from the practice of law for three years and be assessed the costs of the proceeding. We accept the board's and panel's findings but modify the period of suspension to one year and one day.

**I**

Based on the testimony of the complainant's witnesses and the respondent's witnesses, including the respondent, and the exhibits introduced at the hearing, the hearing board found that the following facts were established by clear and convincing evidence.

**A**

*The Thompson Matter*

In March 1989, the respondent's law firm was hired by Fran Thompson to represent her three-year-old daughter in connection with injuries the daughter sustained in an automobile accident in June 1988. An associate of the respondent's firm represented the daughter until leaving the firm in July 1989. The respondent assumed responsibility for the Thompson case, and in early 1990, he spoke with the senior claims representative

---

1. The respondent was admitted to the bar of this court on April 30, 1980, is registered as an attorney upon this court's official records, and is subject to the jurisdiction of this court and its grievance committee in these proceedings. C.R.C.P. 241.1(b).

for Maryland Casualty Company. The claims representative wrote first to confirm the telephone conversation, and wrote again in February 1990, to describe the difficulties she had had in contacting the respondent, and to request the previously promised medical reports and authorizations. On March 29, 1990, the claims representative wrote to the respondent again and asked for supporting documentation of the child's injuries. The claims representative enclosed a check in the amount of $12,500 as a proposed settlement for all damages the girl had sustained in the accident.

The respondent sent the claims representative a $20,000 settlement counter-offer, and in June 1990 he submitted the requested medical records. Sometime before October 11, 1990, Thompson authorized the respondent to settle her daughter's personal injury case for the $12,500, and the respondent told her he would prepare the documents necessary to obtain probate court approval of the minor's settlement. Thompson signed the $12,500 settlement check on October 15, 1990, and the respondent deposited the proceeds into his trust account.

Between January and March 1991, another Maryland Casualty representative unsuccessfully attempted on several occasions to contact the respondent about court approval of the settlement. Although he had not filed the settlement documents with the court yet, the respondent told the representative in April 1991 that he was in the process of obtaining a court date to secure approval.

Due to her unsuccessful attempts to communicate with the respondent, Thompson became frustrated and hired another lawyer in September 1991. When the new lawyer was unable to contact the respondent, he filed a civil action against the respondent on behalf of the child. Under a settlement reached between the respondent and Thompson and her new lawyer, the respondent filed the probate documents and scheduled a hearing. The court appointed Thompson as conservator for the child in December 1991, and granted her leave to settle the child's personal injury claim. On December 9, 1991, the respondent paid Thompson $10,000 for the personal injury settlement, and paid himself

$2,500, although the original contingent fee agreement would have allowed the respondent to retain one-third of the recovery. The respondent paid Thompson an additional $1,300 consisting of $800 interest for the time period he exercised control over the funds, and $500 for Thompson's new lawyer's fees.

During the thirteen-month period that the settlement proceeds were in the respondent's trust account, the trust account balance occasionally fell below $12,500, but not less than $10,000. The trust account balance dropped to below $12,500 because the respondent advanced settlement funds to other clients before the other clients' settlement checks were properly negotiated.

The respondent stipulated that his conduct in the Thompson matter violated DR 6–101(A)(3) (a lawyer shall not neglect a legal matter entrusted to the lawyer). The hearing board concluded that the respondent also violated DR 7–101(A)(3) (a lawyer shall not intentionally prejudice or damage the lawyer's client during the course of the professional relationship); DR 9–102(B) (a lawyer shall not mishandle the funds or property of a client); DR 9–102(B)(3) (failure to maintain complete records of client property in the possession of the lawyer and to render appropriate accounts to the client regarding the property); and DR 9–102(B)(4) (a lawyer shall promptly pay or deliver to the client as requested by the client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive). The board found, however, that the assistant disciplinary counsel had not proved that the respondent's conduct in the Thompson matter was dishonest or deceitful, and the board recommended that the allegation that he had violated DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation) be dismissed.

### B

#### *The Mesick Matter*

The respondent was retained in 1989 to represent Richard E. Mesick in his claim for a share of his father's estate, and later to assist Mesick in the management of funds

received from the estate. Mesick was an elderly man, and according to an expert psychiatric opinion, was impaired by reason of mental illness, mental deficiency, physical illness or disability, meeting the definition of an "incapacitated person"[2] in 1992; and Mesick remained unable to testify as to the facts of the present case in April 1994. The respondent had previously befriended Mesick when they were neighbors, and had provided him free legal services.

In July 1989, the administrator of the father's estate sent the respondent a check in the amount of $65,416.32, consisting of estate income payable to March 31, 1989. The respondent opened a bank account under the name of the "Richard E. Mesick Trust Account, Israel Galindo, Trustee" on July 10, 1989. He deposited all but $5,000 of the estate income into this account. The respondent deposited the remaining $5,000 into Mesick's personal account.

In October 1989, the respondent cashed a trust account check in the amount of $20,000 and received a cashier's check in that amount in his name. A portion was to be used to pay Mesick's taxes, and the rest was to be lent to two of the respondent's clients. The respondent testified that Mesick authorized him to use the $20,000 this way.

The respondent was one of the directors of a corporation which was to primarily broker automobile loans, and he agreed to invest in the corporation. The respondent intended to use his personal savings as an investment in the beginning of 1990. When a representative of the corporation approached the respondent in October 1989 for the funds to be invested, however, the respondent gave him the $20,000 cashier's check. Mesick did not authorize the respondent to use the funds from his trust account for the respondent's personal benefit.

Using his personal funds, the respondent loaned $9,750 to one client, and $4,750 to another client. Of these loans, a total of $7,600 was made payable to Mesick, although only $1,000 had actually been provided by Mesick by way of a trust account check. The loans were made for the clients' personal living expenses and medical care, in anticipation of settling their respective cases. The ability of the clients to repay the loans was contingent upon successful resolutions of their personal injury and workers' compensation cases. The loans provided with Mesick's money were zero interest loans. The respondent routinely reduced his fees to clients, but he told Mesick that the two clients would be required to pay the fees originally agreed on. The respondent would then reduce the fee he retained, and he would pay the difference to Mesick as "interest."

The respondent used his own money on February 5, 1992, to pay $12,177.31 that Mesick owed the Internal Revenue Service. On February 14, 1992, the respondent paid $1,956 from his personal funds to the Colorado Department of Revenue for back taxes and penalties owed by Mesick. In March and July 1992, the respondent made a total of $10,250 in repayments to Mesick for the two loans to the other clients. These repayments allowed approximately $2,650 in "interest" for the loans, and occurred after the clients settled their respective cases.

The respondent stipulated that his loans to clients in the Mesick matter violated DR 5-103(B) (while representing a client in connection with contemplated or pending litigation, a lawyer shall not, subject to certain exceptions not applicable here, advance or guarantee financial assistance to the client). The respondent also agreed that he violated DR 9-102(A) (all funds of clients paid to the lawyer shall be deposited in one or more identifiable interest-bearing depository accounts maintained in the state in which the law office is located), and DR 9-102(B)(2) (a lawyer shall identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable). The respondent further stipulated that he neglected the Mesick matter, contrary to DR 6-101(A)(3).

The hearing board however rejected the assistant disciplinary counsel's most serious charge, that the respondent knowingly and intentionally converted Mesick's funds.

2. *See* § 15-14-101(1), 6B C.R.S. (1994 Supp.).

Based on the evidence presented at the hearing, the board found that the respondent's account of his handling of the Mesick trust funds was credible and persuasive, and the board concluded that the respondent's mishandling of the funds was the result of neglect rather than dishonesty.

■ The board found the following factors especially compelling: (1) the respondent's demonstrated social commitment over the previous twenty years made it incredible to believe that the respondent would suddenly prey upon a vulnerable client; (2) the respondent's reputation for integrity and honesty was inconsistent with the willful conversion of client funds; (3) the respondent's testimony at the hearing was forthright and he voluntarily stipulated to several charges against him that would have been difficult if not impossible to prove given that Mesick could not testify at the hearing; (4) the respondent was experiencing considerable personal stress at the time he handed the check over to the representative of the corporation, making it believable that he acted hastily and without consideration of how his actions would be viewed later; and (5) the respondent had represented Mesick over a number of years on a *pro bono* basis, making it unlikely that he would abruptly begin to treat Mesick as a dupe. We conclude that the board's finding is supported by substantial evidence in the record. *People v. Wechsler,* 854 P.2d 217, 220–21 (Colo.1993) (supreme court will not overturn hearing board's conclusion that intentional conversion was not established by clear and convincing evidence unless there is no substantial evidence in the record to support conclusion).

## II

■ The hearing board recommended that the respondent be suspended for three years and be assessed the costs of the proceeding. Neither the assistant disciplinary counsel nor the respondent has excepted to the board's findings or recommendation. Under the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) (ABA *Standards*), in the absence of aggravating or mitigating circumstances, "[s]uspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client." ABA *Standards* 4.12. *See Wechsler,* 854 P.2d at 222–23 (suspension appropriate where conversion is not intentional or willful); *People v. McGrath,* 780 P.2d 492, 493 (Colo.1989) (when a lawyer knows or should know that he is dealing improperly with client property, suspension, at the least, is appropriate). The length of suspension will depend on the presence of aggravating and mitigating factors. *Wechsler,* 854 P.2d at 222.

The hearing board found the presence of the following factors in mitigation: (1) the absence of a prior disciplinary record, ABA *Standards* 9.32(a); (2) the absence of a dishonest or selfish motive, *id.* at 9.32(b); (3) the existence of personal or emotional problems at the time of the misconduct, *id.* at 9.32(c); (4) a cooperative attitude toward the proceedings, *id.* at 9.32(e); (5) the respondent's minimal experience in the private practice of law, *id.* at 9.32(f); (6) his good character or reputation, *id.* at 9.32(g); and (7) the respondent's demonstration of remorse, *id.* at 9.32(*l* ). The board also determined that the respondent's voluntary closure of his law office and break from the practice of law constituted interim rehabilitation, and the imposition of other penalties or sanctions, *id.* at 9.32(k).

In aggravation, the board found the existence of multiple offenses, *id.* at 9.22(d), and the vulnerability of the victim, *id.* at 9.22(h).

■ After examining the report and recommendation of the board and panel, and considering the seriousness of the respondent's misconduct with the presence of the factors in aggravation and mitigation, we determine that a period of suspension is warranted. We also conclude that suspension for one year and one day is appropriate and is sufficient to protect the public. *See People v. Robbins,* 869 P.2d 517, 519 (Colo.1994) (purpose of lawyer discipline is to protect the public, not to punish the lawyer). Further, a suspension of this length is more consistent with our prior cases. *See Wechsler,* 854 P.2d at 223 (misrepresenting location of client's

fund and failing to account for funds collected over a two year period warrants suspension for one year and one day); *People v. Kearns,* 843 P.2d 1, 5 (Colo.1992) (misrepresentations to client, and dishonest assignment of promissory note warrant suspension for one year and one day where attorney had no previous disciplinary record); *McGrath,* 780 P.2d at 493–94 (lawyer's commingling and technical conversion of client's funds warrants one year and one day suspension). We therefore modify the panel's recommendation of discipline to suspension for one year and one day.

### III

Accordingly, it is hereby ordered that Israel Galindo be suspended from the practice of law for one year and one day, effective thirty days after the issuance of this opinion. C.R.C.P. 241.21(a). It is further ordered that Galindo pay the costs of this proceeding in the amount of $1,979.40 within 90 days after the announcement of this opinion to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 920–S, Denver, Colorado 80202. Galindo shall not be reinstated until after he has complied with C.R.C.P. 241.22(b)–(d).