The PEOPLE of the State of
Colorado, Complainant,

v.

Michael Anthony VARALLO,
Attorney–Respondent.

Nos. 94SA145, 94SA459.

Supreme Court of Colorado,
En Banc.

Feb. 12, 1996.

Rehearing Denied March 18, 1996.

Linda Donnelly, Disciplinary Counsel, James C. Coyle, Assistant Disciplinary Counsel, Denver, for Complainant.

Daniel J. Post, Greeley, for Attorney–Respondent (No. 94SA145).

Michael Anthony Varallo, Greeley, Pro Se (No. 94SA459).

PER CURIAM.

We have consolidated two lawyer discipline proceedings involving the respondent for the purpose of issuing one opinion and order. In No. 94SA145, a hearing panel of the supreme court grievance committee approved the findings and recommendation of a hearing board that the respondent be suspended from the practice of law for three years. The same hearing panel approved the findings and recommendation of a second hearing board in No. 94SA459 that the respondent pay restitution and be suspended for one year and one day for additional ethics violations. The respondent's misconduct in No. 94SA145 involved the knowing conversion of client funds and, consistent with our previous decisions, disbarment is appropriate.

## I.

The respondent was admitted to the Colorado bar in 1973. On May 22, 1993, we immediately suspended him from the practice of law based on allegations contained in the present proceedings. See C.R.C.P. 241.8. By way of a motion to dismiss, the respondent asserts that these disciplinary proceedings violate due process and equal protection. We address the constitutional claims first.

The respondent alleges that (1) "[t]he Colorado discipline process is facially in violation of the due process and equal protection clauses of both the Colorado and United States Constitutions"; and (2) "[a]s applied in this case, the actions of the grievance committee, the disciplinary counsel and the Colorado Supreme Court violate the due pro-

cess and equal protection clauses of both the Colorado and United States Constitutions."

## II. Due Process

 A lawyer in a disciplinary proceeding is entitled to procedural due process, although there is no requirement that the lawyer be afforded the same constitutional safeguards as in a criminal trial. *People v. Morley*, 725 P.2d 510, 514 (Colo.1986). The respondent asserts that the lawyer disciplinary process in Colorado violates state and federal due process guarantees. It allegedly violates due process, on its face, "since one entity, the Colorado Supreme Court, has complete and total control over each and every stage of the process." As applied, it is also alleged to offend due process because "the Respondent has been denied an independent hearing and appeal since the imposition of the immediate suspension pre-judged his entire case, and has prejudiced his case throughout the system." Finally, the respondent claims that he has been denied due process because the crux of the prohibited conduct in this case, conversion of client funds, has not been defined in a manner readily understandable to a licensed lawyer. *See Morley*, 725 P.2d at 517.

### A.

██ "The Colorado Supreme Court, as part of its inherent and plenary powers, has exclusive jurisdiction over attorneys and the authority to regulate, govern, and supervise the practice of law in Colorado to protect the public." *Colorado Supreme Court Grievance Comm. v. District Court*, 850 P.2d 150, 152 (Colo.1993). This power as it is exercised in lawyer discipline proceedings is the basis of the respondent's facial due process challenge. *See People v. Susman*, 196 Colo. 458, 464, 587 P.2d 782, 786 (1978) (as part of its inherent powers, the supreme court has "the ultimate and exclusive responsibility for the structure and administration of disciplinary proceedings against lawyers.")

The supreme court promulgated the former Code of Professional Responsibility and the current Rules of Professional Conduct. Further:

> To effectuate these disciplinary rules, the Colorado Supreme Court adopted the Colorado Rules of Procedure Regarding Lawyer Discipline and Disability Proceedings and Mandatory Continuing Legal Education and Judicial Education.... *See* C.R.C.P. 241.1 to 260.7. The Rules of Procedure provide the procedural mechanism for attorney disciplinary proceedings and were established to provide an efficient, orderly, and systematic method to govern attorney discipline.

*Colorado Supreme Court Grievance Comm.*, 850 P.2d at 153.

The supreme court grievance committee is appointed by the supreme court. At the time of the proceedings in this case, it was composed of nineteen members, fifteen of whom must be members of the Colorado bar. C.R.C.P. 241.2(a)(1), 7A C.R.S. (1990 & 1995 Supp.).[1] The members of the committee "serve at the pleasure of the Colorado Supreme Court." *Id.* The members of the committee elect a chair, who then appoints two vice-chairs, one for each grievance committee panel:

> (c) **Panels.** The Chairman shall divide the Committee into two panels of nine members each. Seven members of each panel must be members of the Bar of Colorado. The Chairman shall be an ex-officio member of each panel.
>
> Each panel may act as both an inquiry panel and a hearing panel, as described in these Rules. However, no panel shall act as both the inquiry panel and the hearing panel on the same matter. All matters referred to one panel for inquiry, if subsequently referred for hearing, must be heard by the other panel or a board thereof.

C.R.C.P. 241.2(c). The supreme court also appoints a disciplinary counsel who serves "at the pleasure of the Supreme Court." C.R.C.P. 241.4(a). An investigator (who is either a member of the grievance committee, a lawyer appointed by the committee, the disciplinary counsel, or a member of the dis-

---

1. Effective September 21, 1995, the grievance committee consists of twenty-five members, eigh-teen of whom shall be members of the Colorado bar. C.R.C.P. 241.2(a)(1).

ciplinary counsel's staff) investigates the alleged misconduct of licensed lawyers. C.R.C.P. 241.10.

At the conclusion of the investigation, the investigator submits a report to one of two grievance committee panels, sitting as an inquiry panel. C.R.C.P. 241.11(a). The inquiry panel may direct further investigation, dismiss the allegations as being without merit or for failure to establish reasonable cause to believe grounds for discipline exist, admonish the lawyer, or authorize the disciplinary counsel to file a formal complaint. *Id.*

If the investigation results in the filing of a formal complaint, a hearing is conducted before a three-member hearing board designated by the chair or a vice-chair of the committee. C.R.C.P. 241.14. The panel of the grievance committee that was not the inquiry panel in a particular case is the hearing panel for that case. The hearing panel's vice-chair, or the chair of the committee, designates the hearing board as follows:

(b) **Designation of a Hearing Board.** All hearings on complaints seeking disciplinary action against a respondent shall be conducted by a hearing board designated by the Chairman or a Vice–Chairman. A hearing board shall consist of at least three persons. At least one member of every hearing board shall be a member of the hearing panel or a former member of the Committee, and at least two members of every hearing board shall be members of the Bar of Colorado.

C.R.C.P. 241.14(b). At the conclusion of the proceedings before the hearing board, the hearing panel reviews the board's report, and considers any objections filed by the parties to the report. C.R.C.P. 241.15(b). The hearing panel then may dismiss the formal complaint filed against the lawyer, impose an admonition, or refer the matter to the supreme court with a recommendation for discipline. *Id.*

This court is not bound by the recommendation, however, and ultimately decides what discipline, if any, is appropriate. *Colorado Supreme Court Grievance Comm.,* 850 P.2d at 153. The parties may file exceptions in the supreme court to the findings below and the hearing panel's recommendation of discipline. C.R.C.P. 241.20(b).

The gist of the respondent's argument is that this court wields complete control over five components of the discipline process: rule-making, investigation, prosecution, decision-making, and appeal. For practical purposes, however, the court entirely controls only the rule-making and appeal functions. The investigative, prosecutorial, and decision-making functions are delegated to the disciplinary counsel and to the grievance committee.

Moreover, the investigative and prosecutorial functions are exercised by the Office of Disciplinary Counsel and the inquiry panel, and are functionally separate from the decision-making function of the hearing board and hearing panel. No member of the hearing board or hearing panel can exercise investigative or prosecutorial functions because of the separation between the inquiry panel and hearing panel, C.R.C.P. 241.2(c), and between the Office of Disciplinary Counsel and hearing panel. The fact that the members of the grievance committee and the disciplinary counsel are appointed by the supreme court is not enough by itself to establish a per se violation of due process.

This case presents even less probability of a biased decisionmaker than *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). In *Withrow,* a three-judge federal district court had held that insofar as state statutes authorized suspension or revocation of a physician's license by the Wisconsin Medical Examining Board without the intervention of a neutral detached decisionmaker, they were unconstitutional. The Supreme Court disagreed, and reversed:

The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk

of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

*Withrow,* 421 U.S. at 47, 95 S.Ct. at 1464. Nothing in the structure of the disciplinary rules, the grievance committee, or the Office of Disciplinary Counsel overcomes this "presumption of honesty and integrity in those serving as adjudicators...." *Id.* Furthermore, the adjudicators do not review their own decisions since the ultimate power of review is held by this court. *Cf. id.* at 58 n. 25, 95 S.Ct. at 1470 n. 25 (allowing a decision-maker to review and evaluate his or her own prior decisions may raise due process problems not present in the Wisconsin administrative scheme).

Our holding is in accord with decisions from other state courts that have considered the due process issue. *See In re Crooks,* 51 Cal.3d 1090, 275 Cal.Rptr. 420, 426, 800 P.2d 898, 904 (1990) (combination of investigative and adjudicative functions in one government agency in attorney disciplinary proceeding does not, without more, constitute a due process violation); *In re Zoarski,* 227 Conn. 784, 632 A.2d 1114, 1121 (1993) (combination of investigatory and adjudicatory functions in professional disciplinary proceedings does not violate due process); *State v. Turner,* 217 Kan. 574, 538 P.2d 966, 974–75 (1975) (commingling of prosecution and adjudicative functions by the Kansas Board of Law Examiners does not deny due process in disciplinary proceeding); *In re Baun,* 395 Mich. 28, 232 N.W.2d 621, 623–24 (1975) (lawyer disciplinary proceedings in Michigan do not violate due process since the functions of investigation, prosecution, adjudication, and review are functionally separate and exercised by different individuals); *In re McCune,* 717 P.2d 701, 706 (Utah 1986) (it is not unconstitutional per se for a single administrative agency to perform both investigative and adjudicative functions; Rules of Discipline of the Utah State Bar adequately divide investigative and adjudicative functions so that the integrity of the process is protected); *Mendicino v. Whitchurch,* 565 P.2d 460, 467 (Wyo.1977) (particular combination of investigative, accusatory, and adjudicative functions as set forth in Wyoming

lawyer disciplinary rules did not violate due process).

Cases where due process was violated present clearly different facts. *See In re Ross,* 99 Nev. 1, 656 P.2d 832, 840 (1983) (procedure by which Board of Bar Governors functioned as factfinder in disciplinary proceeding against attorneys, involving costs which were substantial and recoverable by state bar only upon finding of misconduct, violated due process); *Tweedy v. Oklahoma Bar Ass'n,* 624 P.2d 1049, 1054–55 (Okla. 1981) (supreme court itself could not order reinvestigation of attorney disciplinary grievance, since such was an executive function which it could not exercise consistently with minimum standards of due process).

■ The conclusion that the lawyer disciplinary procedures are not per se unconstitutional, however, "does not, of course, preclude a court from determining from the special facts and circumstances present in the case before it that the risk of unfairness is intolerably high." *Withrow,* 421 U.S. at 58, 95 S.Ct. at 1470.

### B.

■ The respondent contends that as applied in this particular case the disciplinary process violated due process. First, he asserts that because he was immediately suspended from the practice of law under C.R.C.P. 241.8 in May 1993 by this court's order, the merits of his conduct were prejudged, and the hearing panel and hearing board were effectively foreclosed from making any finding other than that he knowingly converted client funds. C.R.C.P. 241.8 provides in part:

> Immediate suspension is the temporary suspension by the Supreme Court of a lawyer's license to practice law for a definite or indefinite period of time while proceedings conducted pursuant to this Rule and these Rules are pending against him. Although a lawyer's license to practice law shall not ordinarily be suspended during the pendency of such proceedings, when there is reasonable cause to believe that a lawyer is causing immediate and substantial public or private harm because he has

**6**

been convicted of a serious crime as defined by C.R.C.P. 241.16(e), *or because he has converted property or funds,* or because he has engaged in conduct which poses an immediate threat to the effective administration of justice, the Supreme Court may order the lawyer's license to practice law immediately suspended.

(Emphasis added.) The court considers imposition of an immediate suspension on the petition of the grievance committee or disciplinary counsel, and the petition must be supported by affidavit "setting forth sufficient facts to give rise to reasonable cause that the alleged conduct has in fact occurred." *Id.*

The petition filed in this case by the assistant disciplinary counsel alleged that the respondent had converted client funds and that there was reasonable cause to believe that he was causing immediate and substantial harm. The respondent through his lawyer filed a response to this court's rule to show cause why he should not be immediately suspended. After considering the response, we entered an order immediately suspending the respondent from the practice of law pending further disciplinary action, effective May 22, 1993. The formal complaint in No. 94SA145 embraced the allegations in the petition for immediate suspension, and a hearing was held before a hearing board on January 12, 1994. Six months following the hearing, the respondent filed the first of a number of petitions for dissolution of the immediate suspension order, pursuant to C.R.C.P. 241.8. Because the respondent had already been afforded a hearing on the charges, and the factual findings of the board supported the allegations of the petition for immediate suspension, we denied the respondent's motions to dissolve the order of immediate suspension.

The fact that the respondent received notice of the petition in this case and appeared by counsel in this court in response to the rule to show cause protected his due process rights. Immediate, temporary, or interim suspensions have the same effect as preliminary injunctions. *See In re Malvin,* 466 A.2d 1220, 1223 (D.C.App.1983). The commentary to Rule 20 of the ABA Model Rules for Lawyer Disciplinary Enforcement (1993) likens immediate interim suspension, which may be accomplished ex parte, to a temporary restraining order which does not expire automatically. Since immediate suspension under C.R.C.P. 241.8 contemplates the issuance of notice to and an opportunity for the respondent to be heard, it is closer to a preliminary injunction.

■ Procedural due process is implicated any time a lawyer's license to practice is even temporarily suspended, *see Conway v. State Bar of California,* 47 Cal.3d 1107, 255 Cal. Rptr. 390, 393–94, 767 P.2d 657, 660 (1989), but an interim suspension does not require a full evidentiary hearing. *In re Cummings,* 466 A.2d 1224, 1225 (D.C.App.1983) (hearing before court of appeals at which attorney's counsel appeared after ample notice and was heard in opposition to petition for temporary suspension was sufficient to protect due process). The procedure followed in temporarily suspending the respondent's license to practice law did not violate due process. Nor does the respondent advance any evidence that this court's actions in ordering the suspension affected the deliberations of the hearing boards and hearing panel in this case. The *factual* basis of the respondent's misconduct has not been strongly contested, nor does the respondent contest the factual findings (in contrast to the legal ramifications of those findings) in either his motion to dismiss or his exceptions. Both of the hearing boards as well as the hearing panel in these proceedings heard the complainant's objections and recommended that the respondent be suspended rather than disbarred.

Second, the respondent claims that he has been denied due process because certain prohibited conduct in this case, i.e., the conversion of client funds, has not been defined in a manner readily understandable to a licensed lawyer. *See Morley,* 725 P.2d at 517. We reject this contention in part VI of this opinion and address the meaning of conversion or misappropriation of client funds as developed in lawyer discipline cases.

### III. Equal Protection

 The respondent asserts that the immediate suspension in this case violated equal protection because it will result in a longer suspension in his case than in other comparable cases involving technical or negligent conversion of client funds, and cases where there was no immediate suspension imposed. In the first place, equal protection does not require that all similar attorney misconduct be sanctioned identically. *People v. Senn*, 824 P.2d 822, 824 (Colo.1992); *Bourdon's Case*, 132 N.H. 365, 565 A.2d 1052, 1058 (1989).

Second, the lawyer discipline cases involving negligent conversion are discussed below and they do *not* involve misconduct similar to the respondent's because the lawyer's mental state is an important factor in determining the level of discipline. *See* ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) (ABA *Standards* ) 3.0(b). Finally, the respondent's immediate suspension will not in fact result in disparate treatment because we have determined to apply the discipline in this case, disbarment, retroactively to the date of his immediate suspension. The respondent's equal protection arguments are without merit. The motion to dismiss is therefore denied.

### IV.

The hearing board in No. 94SA145 found the following facts were established by clear and convincing evidence.

### A.

The respondent represented Heidi Fedderson, the daughter of Jens Junior Fedderson, and an heir to his estate. On or about December 10, 1990, the respondent received a death benefit check in the amount of $1,000 from an insurance company, made payable to "Mike Varallo, attorney at law for the estate of Jens Junior Fedderson." The respondent deposited the check in his trust account about December 12, 1990. When he deposited the check, however, his trust account was overdrawn in the amount of $7.12, resulting in a balance after the deposit of $992.88.

On December 5, 1990, Heidi Fedderson retained another lawyer to represent her, and the new lawyer advised the respondent that she would be substituting as counsel.

Also during December 1990, the respondent wrote a check to himself drawn on the trust account, and in the amount of $900. The withdrawal caused the trust account to drop to $92.88, thereby depleting almost all of the funds that the respondent held in trust for the benefit of the Fedderson estate. After learning from the insurer that the respondent had received the $1,000 check for the Fedderson estate, Heidi Fedderson's new lawyer wrote a letter in February 1991 to the respondent asking about the insurance funds. The respondent did not reply.

In the meantime, the respondent had discussions with the personal representative of the estate regarding disbursement of the $1,000. The respondent and the personal representative agreed that the respondent would withdraw his fee for representing Heidi Fedderson from the insurance funds.

On April 26, 1991, the respondent sent letters to the personal representative and Heidi Fedderson's new lawyer explaining the circumstances of his receipt of the insurance funds. He further indicated that his legal fee for representing Heidi Fedderson was $250.00. The respondent requested written directions from the personal representative and the new lawyer for disbursement of the funds.

On May 23, 1991, the Public Administrator of Weld County was appointed as the personal representative of the estate. Within a few days of his appointment, the new personal representative asked the respondent to deliver the insurance funds to him, but the respondent did not comply. The respondent was requested in June, July, and September, 1991 to deliver the funds, and the personal representative set a September 18, 1991 deadline. When the respondent did not deliver the funds, he was advised that the personal representative would initiate contempt proceedings against him. The respondent delivered a check drawn on his trust account in the amount of $762.50 (deducting $237.50 as legal fees). On or about October 4, 1991, however, the respondent's check,

drawn on his *trust* account, was returned due to insufficient funds.

The personal representative told the respondent's secretary that he would request an immediate hearing regarding the funds if they were not delivered to his office. Finally, on October 9, 1991, ten months after receiving the estate's funds and after paying himself $900 of the estate's funds, someone from the respondent's office delivered $762.50 in cash to the personal representative.

The hearing board concluded that the respondent converted funds belonging to the Fedderson estate, and failed to promptly deliver the funds as requested by the personal representative. The foregoing conduct violated DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1–102(A)(6) (a lawyer shall not engage in conduct that adversely reflects on the lawyer's fitness to practice law); and DR 9–102(B)(4) (a lawyer shall promptly pay or deliver to the client as requested by the client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive).

## B.

In October 1991, a lawyer asked the respondent to be co-counsel in a medical malpractice case involving that lawyer's ex-spouse, Marjorie Goter. It was agreed that the respondent would receive a percentage of any award. They were unsuccessful at the arbitration hearing, and the respondent's fee was renegotiated so that the respondent was to be paid an hourly fee and would be compensated for any costs he advanced. The respondent's co-counsel later settled the medical malpractice case for $15,000.00, and the fee agreement was again amended to provide that the respondent receive $2,000 in legal fees.

In August 1992, the respondent received a check for $5,000.00, in partial settlement of the malpractice claim. He deposited the check into his trust account on September 3, 1992. At the time of the deposit, however, the trust account was overdrawn in the amount of $991.49. The $5,000 deposit therefore resulted in a trust account balance of $4,008.51.

The respondent's co-counsel and the medical malpractice defendant's lawyer agreed that the settlement funds would not be disbursed until the court signed an order approving the settlement agreement, which did not occur until mid-October 1992. Nevertheless, beginning on September 8, 1992, the respondent used the funds in the trust account, including the funds belonging to Marjorie Goter. By October 7, 1992, there was a negative balance in the trust account of $159.25. Finally, on November 27, 1992, the respondent wrote Marjorie Goter a trust account check in the amount of $3,000. At that time, there were sufficient funds in the trust account to cover the check.

The respondent's conduct violated DR 1–102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation); and DR 1–102(A)(6) (conduct adversely reflecting on lawyer's fitness to practice). The hearing board specifically found that the respondent did not violate DR 9–102(B)(4) (failure to pay or deliver client funds as requested), since although he disbursed the funds to *himself,* they were not available for disbursement to the client until the settlement agreement was approved in mid-October 1992.

## C.

The hearing board also found that from September 1991 to November 1992 the respondent commingled the funds belonging to the Fedderson estate and to Marjorie Goter with his business and personal funds in his trust account. This commingling of funds violated DR 1–102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation); and DR 9–102(A) (all funds of clients paid to the lawyer shall be deposited in one or more identifiable interest-bearing depository accounts maintained in the state in which the law office is located).

## D.

In October 1990, Rene Killough retained the respondent to represent her son, Sean Killough, in a domestic violence case involv-

ing Sean Killough's wife, and in a dissolution of marriage action filed by the wife. Rene Killough paid the respondent $2,000 pursuant to an oral fee agreement, and an additional $40.00 for a filing fee in December 1990.

Sean Killough and his wife soon reconciled. The dissolution proceedings were either suspended or dismissed, and the criminal charges were dismissed. Because of the reconciliation, the respondent did not have to file an answer in the dissolution proceeding and thus did not pay the $40.00 filing fee.

Rene Killough wrote to the respondent on March 22, 1991, asking for an accounting of the $2,000 legal fee and a refund of the $40.00 filing fee. The respondent's daughter subsequently advised Rene Killough that the respondent would not respond to Killough's request because she was not his client, and that any such requests would have to come from her son. Nevertheless, when Sean Killough wrote a letter to the respondent on July 26, 1991, asking for a refund of the filing fee, the respondent did not reply. The respondent did not provide a prompt accounting or refund to the Killoughs as requested, although the respondent's daughter told Rene Killough that the respondent had received her son's letter, was acting on it, and might refund more than $40.00 to them.

During the summer of 1991, the respondent suffered from acute thyroiditis. In December 1991, the respondent told Rene Killough that he would "try" to provide the refund before Christmas. Nevertheless, the respondent did not provide an accounting or a refund until August 7, 1992, over seven months after Christmas. On October 2, 1992, he refunded an amount acceptable to the Killoughs.

The hearing board determined that the respondent's conduct violated DR 9-102(B)(3) (failure to maintain complete records of client property in the possession of the lawyer and to render appropriate accounts to the client regarding the property), and DR 9-102(B)(4) (a lawyer shall promptly pay or deliver to the client as requested by the client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive). The board also concluded that it had not been estab-

lished by clear and convincing evidence that the respondent violated DR 1-102(A)(4).

## V.

The respondent defaulted in No. 94SA459, and the factual allegations of the complaint were therefore deemed admitted. *People v. Farrant*, 883 P.2d 1, 1 (Colo.1994). Based on the default, and the evidence tendered at the hearing, including the respondent's testimony in mitigation, the board made the following findings by clear and convincing evidence.

## A.

Roxann Larsen hired the respondent to represent her in a post-dissolution matter involving child custody issues. She paid him a $1,500 refundable retainer on January 15, 1993. The respondent deposited the entire amount into an account entitled, "Mike Varallo, Attorney at Law," about four days later.

Larsen informed the respondent that she no longer wanted to proceed with the post-dissolution matter, and she terminated the representation on February 23, 1993. She also requested a refund of her retainer as soon as possible.

The respondent had done some work on the Larsen case before his representation was discontinued and, based on his hourly rate and the time expended, his earned fees totalled $675.00 and he therefore owed Larsen a refund of $825.00. Before Larsen even asked for a refund, however, the respondent's account was overdrawn in the amount of $8.21. The respondent had therefore already used the entire amount of Larsen's refundable retainer.

The respondent did not return Larsen's telephone calls on four occasions between February 26 and March 4, 1993. When Larsen went to the respondent's office on March 5, she was given a check for $825.00 and an accounting for the $625.00 in services rendered. However, the respondent's check was returned for insufficient funds.

The respondent told Larsen to redeposit the check on March 19, 1993, and he would transfer funds to cover it, but when she did, the check was again returned for insufficient

funds. Larsen then spoke with the respondent on March 24, 1993, and he told her to come to his office the next day and he would pay her in cash. Larsen appeared the next day at the respondent's office, but he had no money for her.

On March 31, 1993, Larsen filed a complaint with the Weld County district attorney's office, and a request for investigation with the Office of Disciplinary Counsel on May 4, 1993. The respondent provided Larsen with a $900 refund on May 25, 1993.

The hearing board found that the foregoing conduct, which occurred following the effective date of the Rules of Professional Conduct (January 1, 1993) violated R.P.C. 1.15(b) (failure to promptly refund unearned client funds); R.P.C. 8.4(c) (engage in conduct involving dishonesty, fraud, deceit or misrepresentation); and R.P.C. 8.4(h) (engage in conduct that adversely reflects on the lawyer's fitness to practice law). The board specifically concluded that the respondent's appropriation of Larsen's refundable retainer was unauthorized.

### B.

From January 1993 through April 1993, the respondent commingled client funds with his business and personal funds, contrary to R.P.C. 1.15(a). The board found, however, that the admitted fact of commingling did not, by itself, establish a violation of R.P.C. 8.4(c), as charged in the complaint.

### C.

The respondent represented Judy Dankenbring in a dissolution of marriage action. As part of the representation, the respondent hired Thomas H. Pierce to investigate and locate assets belonging to Dankenbring's husband. The respondent agreed to pay Pierce $55 per hour if assets were found, but Pierce would be reimbursed for only his costs if no assets were located.

Pierce did find assets of Dankenbring's husband, and he billed the respondent $1,846.30 for services rendered. The respondent made no payments to Pierce until April 8, 1992, when he paid $300.00. Pierce filed an action in small claims court against the respondent, but before the July 6, 1992, hearing, the parties agreed that the respondent would enforce an attorney's lien against his client's property settlement, and that the respondent would pay Pierce off before reducing the outstanding attorney fees balance. The respondent made payments to Pierce through January 12, 1993, totalling $1,050.00.

The respondent's conduct in the Dankenbring matter violated DR 1–102(A)(4) and R.P.C. 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation); as well as DR 1–102(A)(5) and R.P.C. 8.4(h) (conduct prejudicial to the administration of justice).

### VI.

 The hearing board in No. 94SA145 determined that the respondent "intentionally and knowingly used client funds for his personal benefit during the period of time after receipt of the funds and prior to delivery of the funds to the Fedderson estate or to Ms. Goter." The board further concluded, however, that "the complainant failed to provide clear and convincing evidence that respondent intended to *permanently* deprive the Fedderson estate and Marjorie Goter of the use or benefit of these funds." The board therefore found that a sanction as severe as disbarment was not warranted, based on its interpretation of *People v. McGrath,* 780 P.2d 492 (Colo.1989). The board's interpretation is not correct.

While in many cases the lawyer did intend to permanently deprive the victim of funds, *see, e.g., People v. Guyerson,* 898 P.2d 1062, 1063 (Colo.1995) (lawyer disbarred for stealing law firm and client funds), we have not *required* that the lawyer intend to permanently deprive the client of the funds to knowingly convert client funds for lawyer disciplinary purposes, *see People v. Lefly,* 902 P.2d 361 (Colo.1995) (lawyer's knowing conversion of client funds almost always merits disbarment even if the funds are eventually replaced).

*People v. Marsh,* 908 P.2d 1115, 1119 (Colo. 1996). As the New Jersey Supreme Court held in *In re Roth,* 140 N.J. 430, 658 A.2d 1264, 1272 (1995):

Knowing misappropriation [for which the lawyer is almost invariably disbarred] "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *In re Noonan*, 102 N.J. 157, 160, 506 A.2d 722 (1986). Misappropriation includes "not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." *In re Wilson*, 81 N.J. 451, 455 n. 1, 409 A.2d 1153 (1979). The motive of the lawyer is irrelevant in determining the appropriate discipline for knowing misappropriation.

Moreover, "[i]ntent to deprive permanently a client of misappropriated funds, however, is not an element of knowing misappropriation." *In re Barlow*, 140 N.J. 191, 657 A.2d 1197, 1201 (1995).

■ A "technical conversion," usually warranting suspension rather than disbarment, is a conversion or misappropriation where the complainant either concedes that the misappropriation was negligent, *People v. Dickinson*, 903 P.2d 1132, 1138 (Colo.1995), or it cannot be proven by clear and convincing evidence that the respondent knowingly converted the funds, *People v. Galindo*, 884 P.2d 1109, 1112 (Colo.1994) (board's conclusion that conversion was negligent rather than knowing was supported by the record and would not be overturned); *People v. Wechsler*, 854 P.2d 217, 220–21 (Colo.1993) (supreme court will not overturn hearing board's conclusion that intentional conversion was not established by clear and convincing evidence unless there is no substantial evidence in the record to support conclusion); *McGrath*, 780 P.2d at 493 ("Indeed, if there were not some lingering doubt about whether the respondent engaged in *knowing* conversion of his client's funds, we would have no hesitation in entering an order of disbarment.")

■ For example, depositing client funds into a trust account with a negative balance, if done only negligently, would be a technical rather than knowing conversion of client funds. On the other hand, using client funds for personal use without the client's permission by writing a check on a trust account that the lawyer knows contains only client funds would be a knowing conversion of client funds, whether or not the lawyer intended to eventually replace the funds. The lawyer's mental state is the decisive element:

Because disbarment is the most severe sanction, however, it must be established by clear and convincing evidence that the misappropriation of client funds was knowing, and not merely negligent. *See People v. Galindo*, 884 P.2d 1109, 1112 (Colo.1994) (lawyer suspended rather than disbarred where it was not established that respondent's conversion of funds was knowing or intentional); *see also In re Barlow*, 140 N.J. 191, 657 A.2d 1197, 1200 (1995) (to disbar lawyer for misappropriation of client funds, supreme court must be able to conclude by clear and convincing evidence that misappropriation was knowing).

In this case, the assistant disciplinary counsel has essentially stipulated that it can not be demonstrated by clear and convincing evidence that the respondent's misuse of client funds was knowing or intentional as opposed to negligent.

*Dickinson*, 903 P.2d at 1138.

## VII.

The hearing panel approved the findings and recommendation of a second hearing board in No. 94SA459 that the respondent pay restitution in the Pierce matter in the amount of $796.30, and be suspended for one year and one day. While the board agreed that advance fee payments must be deposited in client trust accounts, it declined to find that the respondent's personal use of these unearned funds constituted a knowing conversion deserving disbarment.

Depositing unearned retainers into business operating account, and spending an unearned client retainer, violated DR 9–102(A), which required lawyers to deposit client funds in a separate account. *People v. Brown*, 863 P.2d 288, 290 (Colo.1993); *see also People v. Shidler*, 901 P.2d 477, 478 n. 1 (Colo.1995); Lester Brickman, *The Advance Fee Payment Dilemma: Should Payments Be Deposited to the Client Trust Account or*

*to the General Office Account?,* 10 Cardozo L.Rev. 647 (1989) (endorsing the majority view that unearned retainers or advance fee payments should be deposited in client trust accounts). The board did not find that the respondent's conduct in spending unearned advance fees constituted knowing conversion warranting disbarment. That precise point need not be decided because of the findings of knowing conversion in No. 94SA145.

### VIII.

Since the respondent's misappropriations in No. 94SA145 were knowing conversions, disbarment is the presumed sanction barring significant factors in mitigation. *People v. Young,* 864 P.2d 563, 564 (Colo.1993); ABA *Standards* 4.11. The hearing boards found the following factors in mitigation: the absence of a prior disciplinary record, ABA *Standards* 9.32(a); and evidence of the respondent's good character in the local legal community, *id.* at 9.32(g). The board in No. 94SA145 also determined that Marjorie Goter's and Sean Killough's satisfaction with the respondent's legal representation was an additional mitigating factor. *Cf.* ABA *Standards* 9.4(f) (failure of client to complain is neither an aggravating nor mitigating factor).

These factors in mitigation, the most significant being the absence of a prior disciplinary record, are insufficient to call for a sanction less than disbarment. *Lefly,* 902 P.2d at 364. Because of the delay in these proceedings and the fact that the respondent has been suspended from the practice of law since 1993, we have decided to make the effective date of the respondent's disbarment May 22, 1993, the effective date of his immediate suspension.

### IX.

It is hereby ordered that Michael Anthony Varallo be disbarred and that his name be stricken from the list of attorneys authorized to practice before this court, effective May 22, 1993. It is further ordered that Varallo pay the combined costs of these proceedings in the amount of $2,995.46 within 90 days of the date of this opinion to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 920–S, Dominion Plaza, Denver,

Colorado 80202. It is further ordered that, prior to any application for readmission and as a condition of readmission, the respondent pay Thomas H. Pierce $796.30, with interest at the legal rate from January 12, 1993.