**The PEOPLE of the State of Colorado,**

**v.**

**Dewayne Dell RYMER.**

**No. 06PDJ067.**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

May 25, 2007.

On March 26, 2007, a Hearing Board composed of KATHLEEN M. O'BRIEN and RALPH G. TORRES, both members of the Bar, and WILLIAM R. LUCERO, the Presiding Disciplinary Judge ("the Court"), held a hearing pursuant to C.R.C.P. 251.18(d). April M. Seekamp appeared on behalf of the Office of Attorney Regulation Counsel ("the People") and Dewayne Dell Rymer ("Respondent") appeared *pro se*. The Hearing Board issues the following Opinion and Order Imposing Sanctions Pursuant to C.R.C.P. 251.19.

### OPINION AND ORDER IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19

### I. *ISSUE/SUMMARY*

Disbarment is generally appropriate, absent significant evidence of mitigation, when a lawyer knowingly uses client funds without authority and causes injury. Respondent, as Trustee, transferred and used approximately $200,000.00 from the trust corpus for his own purposes and without authority. Is disbarment the appropriate sanction in this case?

After creating a trust for a 77–year–old client who wished to provide for himself in his senior years and later for his two daughters after his death, Respondent, over a three-year period, admittedly transferred approximately $200,000.00 to his operating account, made loans to his son, and failed to

account for approximately $32,000.00. Although Respondent testified that the primary beneficiary authorized these transfers, the Hearing Board found this testimony to be incredible.

### *SANCTION IMPOSED:* ATTORNEY DISBARRED

### II. *PROCEDURAL HISTORY*

On October 11, 2006, the People filed a complaint in this matter. Respondent filed an answer on November 9, 2006.[1] On February 5, 2007, the People filed a motion for summary judgment and Respondent filed his response on February 26, 2007. On March 16, 2007, the Court issued an order denying the People's motion for summary judgment. Nevertheless, the Court found that the facts stated in the People's affidavits of investigator Deborah Ortiz and Jerry K. Phelps were undisputed and that the People need not present this evidence in their case-in-chief. *See* C.R.C.P. 56(d). Respondent had no objection to the Court's finding.

### III. *FINDINGS OF MATERIAL FACT*

The Hearing Board finds that the following facts have been established by clear and convincing evidence and hereby adopts and incorporates by reference the Court's factual findings from the "Order Re: Motion for Summary Judgment" dated March 16, 2007. Respondent took and subscribed the oath of admission and gained admission to the Bar of the Colorado Supreme Court on October 24, 1997. He is registered upon the official records of the Colorado Supreme Court, Attorney Registration No. 28946, and is therefore subject to the jurisdiction of the Court.

### *Respondent Meets with Jerry K. Phelps*

Jerry K. Phelps met Respondent and hired him to probate his mother's will in 2001. Thereafter, Respondent encouraged Mr. Phelps to create a family trust. In February 2004, Respondent created the Jerry K. Phelps Family Trust ("Trust"). Mr. Phelps was the primary beneficiary and his two

---

1. On September 13, 2006, the Colorado Supreme Court issued an order immediately suspending Respondent from the practice of law pursuant to C.R.C.P. 251.8(b)(2).

daughters were the secondary beneficiaries of the Trust. Respondent designated himself as Trustee and designated his son, Sam Rymer, as Successor Trustee. The Trust granted Respondent, as Trustee, the authority to manage the Trust's funds and to exercise his discretion with the purpose of providing for Mr. Phelps' financial security in his senior years, and after his death, to provide for his two daughters.[2]

For the purpose of funding the Trust, Mr. Phelps turned over the following assets for Respondent to manage as Trustee of the Trust:

- The deed to a bank building in Bailey, Colorado;
- The deed to 89 Forest Drive, a house in Bailey, Colorado;
- Note receivable from Carol Morris in the approximate amount of $95,000.00;
- Notes receivable from Steve Wilson in the approximate amount of $170,000.00; and
- Oil rights that Mr. Phelps inherited from his mother when she died, which yield approximately $100.00 per month.

Between June 2004 and May 2006, Respondent made numerous withdrawals from the Trust's checking and savings accounts totaling approximately $287,947.59.

### Respondent sets up bank accounts after receiving approximately $165,052.59 from Mr. Phelps

Respondent opened a checking account at Pueblo Bank and Trust and a savings/money market account at Peoples National Bank for the Trust.

In February 2004, Mr. Phelps wire-transferred approximately $165,052.59 to Respondent. These funds were for the purpose of funding the Trust. Respondent deposited $160,000.00 into the Trust's account. When the People questioned Respondent about the unaccounted funds, $5,052.59, Respondent did not explain what he did with these funds.

While acting as the trustee of the Trust and managing the assets of the Trust, Respondent made withdrawals from both the checking and savings accounts totaling $200,795.00. Taking into account withdrawals and deposits into the Trust bank accounts, Respondent's testified that he owes an outstanding balance of $176,270.11 to the Trust. Respondent characterized these withdrawals as loans Mr. Phelps authorized from the Trust pursuant to a retainer agreement between his law firm and the Trust as well as an open line of credit between his law firm and the Trust.[3] Mr. Phelps' did not sign either of these documents and Respondent acknowledges that he never showed them to Mr. Phelps. Furthermore, Mr. Phelps denies that he agreed to *any* of the transfers Respondent made from the Trust, save a single $5,000.00 loan to Sam Rymer.

Beyond the creation of the Trust documents, Mr. Phelps denies authorizing the hiring of Respondent's law firm to do work on behalf of the Trust, authorizing an open line of credit agreement between the Trust and Respondent's law firm; authorizing the withdrawals described above from the Trust. It is undisputed that Respondent never provided Mr. Phelps with evidence of the withdrawals.

Respondent also used Trust funds to make loans to Sam Rymer. Mr. Phelps did authorize *a single loan* for $5,000.00 and stated *he would be possibly willing* to provide two additional $5,000.00 loans after he approved them, but Mr. Phelps never gave permission to Respondent to make any further expenditures without Mr. Phelps' approval. The People identified Trust funds loaned to Sam Rymer in the amount of $46,000.00. Mr. Phelps testified these loans were made without his authorization. In July 2006, Mr. Phelps hired Mr. Fender as trustee after terminating Respondent. Mr. Fender received payment of $36,332.83 from Land America Title Company, which was credited to the Trust for a loan the Trust made to Sam Rymer.

---

2. *See* People's Exhibit 1, Article II of the Trust.

3. *See* People's Exhibits 4 and 5. The only document regarding fees Respondent agreed to charge for his services is a hand written note given to Mr. Phelps on the day the two met to discuss the creation of the trust. *See* People's Exhibit 2.

Finally, there are additional withdrawals from the Trust totaling approximately $32,100.00, which Respondent did not account for when he met with the People in July 2006. Deborah Ortiz, an investigator for the People, prepared a detailed analysis of deposits and withdrawals Respondent made from the Trust's savings and checking accounts Respondent has accounted for, loans to Respondent's son, and other withdrawals for which Respondent had no explanation. Based on this analysis Respondent owes the Trust $231,914.76.

### Deposition and Affidavit of Mr. Phelps

On January 8, 2007, the People deposed Mr. Phelps. Respondent participated in this deposition by telephone. In the deposition, the People asked Mr. Phelps numerous questions about the funds under Respondent's control that are now missing from the Trust. Mr. Phelps credibly testified in his deposition that he did not give Respondent permission to make loans to Respondent's son, withdraw money from the Trust as a line of credit for Respondent's law firm, or keep part of the $165,052.59 Mr. Phelps wire-transferred to Respondent to fund the Trust.[4]

### Respondent's Testimony

Respondent admitted that he transferred funds from the Trust as established by the People's investigation.[5] Respondent maintains that he made these transfers with Mr. Phelps' permission and that Mr. Phelps' has since forgotten that he granted Respondent such authority. Respondent offers that the People's Exhibits 4 and 5 support his position. However, Mr. Phelps signed neither of these documents nor did he ever see them.

## IV. CONCLUSIONS OF LAW— SUBSTANTIVE ALLEGATIONS

■ Respondent asked for a hearing on the sole issue of whether he converted the trust funds he admittedly transferred and used for his own purposes. The Hearing Board heard Respondent's explanation and rejects it. The evidence shows Respondent by clear and convincing evidence that Respondent violated Colo. RPC 8.4(c), conduct involving dishonesty, fraud, deceit, and misrepresentation as charged in Claims I through III.

### Claim I

In Claim I, the People charged Respondent with violation of Colo. RPC 8.4(c), conduct involving dishonesty, fraud, deceit, and misrepresentation for converting $5,052.95 of the $165,052.59 Mr. Phelps wire-transferred to Mr. Phelps in March 2004.

Respondent admits that he deposited all but $5,052.95 of the total of $165,052.59 Mr. Phelps wire-transferred to him. Since Respondent did not have authority to use these funds and offers no explanation as to what he did with them, the Hearing Board finds that he converted these Trust funds.

### Claim II

In Claim II, the People charged Respondent with violation of Colo. RPC 8.4(c), conduct involving dishonesty, fraud, deceit, and misrepresentation for converting $217,195.00 from the corpus of the Trust without authority and thereby converted these funds. Respondent does not contest that he withdrew these funds from the Trust and the Hearing Board finds that he converted these Trust funds.

### Claim III

In Claim III, the People charged Respondent with violation of Colo. RPC 8.4(c), conduct involving dishonesty, fraud, deceit, and misrepresentation for converting $46,000.00 from the corpus of the Trust without authority in order to make loans to his son. The Hearing Board finds that Respondent converted these Trust funds.

---

4. Respondent agreed that the Hearing Board could review and consider the testimony of Mr. Phelps via video deposition. While Mr. Phelps was available for cross-examination during the hearing, Respondent waived his right to further examine Mr. Phelps.

5. Respondent's records show he transferred Trust funds but his accounting shows $41,250.79 less than the People's investigation showed.

## V. SANCTIONS

 The ABA Standards for Imposing Lawyer Sanctions (1991 & Supp.1992) ("ABA *Standards*") and Colorado Supreme Court case law are the guiding authorities for selecting and imposing sanctions for lawyer misconduct. *In re Roose*, 69 P.3d 43, 46–47 (Colo.2003). In imposing a sanction after a finding of lawyer misconduct, the Hearing Board must first consider the duty breached, the mental state of the lawyer, the injury or potential injury caused, and the aggravating and mitigating evidence pursuant to ABA *Standard* 3.0.

### Duties Breached

Respondent breached his duty to manage and handle the Trust for the benefit of Mr. Phelps and his daughters, secondary beneficiaries of the Trust. Furthermore, Respondent violated a duty to the legal profession and the public to maintain his personal integrity.

### State of Mind

Respondent acted knowingly when he transferred the funds from the Trust over a three-year period.

### Injury

Respondent substantially depleted the corpus of the Trust when he transferred over $200,000.00 without authorization. Further, because he has not made restitution, he still owes the Trust approximately $231,914.76.

### Aggravating Factors—ABA Standard 9.22

The Hearing Board finds several aggravating factors exist including dishonest or selfish conduct, a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of his conduct, vulnerable victims, substantial experience in the practice of law, and indifference to making restitution. *See* ABA *Standards* 9.22(b), (c), (d), (g), (h), (i) and (j). Due in part to the absence of any contradictory evidence, the Hearing Board finds clear and convincing evidence to support each aggravating factor.

### Mitigating Factors ABA Standard 9.32

Respondent presented no evidence in mitigation. However, the Hearing Board considered the absence of a prior disciplinary record over fourteen years of practicing law. *See* ABA *Standards* 9.32(a) and (d).

### Analysis of ABA Standards and Case Law

The ABA *Standards* suggest that the presumptive sanction for the misconduct evidenced by the facts and rule violations in this case is disbarment. Respondent knowingly transferred and used over $200,000.00 belonging to the Trust without authorization. Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client. ABA *Standard* 4.11.

 Knowing conversion or misappropriation of client money "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *People v. Varallo*, 913 P.2d 1, 11 (Colo.1996). Neither the lawyer's motive in taking the money, nor the lawyer's intent regarding whether the deprivation is temporary or permanent, are relevant for disciplinary purposes. *Id.* at 10–11. Significant mitigating factors may overcome the presumption of disbarment, however, none are presented in this case. *See In re Fischer*, 89 P.3d 817 (Colo.2004) (finding significant facts in mitigation).

 Respondent knew the funds he took belonged to the Trust; he had no authority to use them for purposes other than those outlined in the trust agreement. Mr. Phelps entrusted Respondent with these funds for Mr. Phelps' benefit, and not for the purpose of providing Respondent extra funds to pay his law firm's expenses. When a lawyer engages in such activity, he converts and misapplies client funds.

## VI. CONCLUSION

One of the primary goals of our disciplinary system is to protect the public from lawyers who pose a danger to it. The facts establish a serious breach of a fiduciary duty, Respondent's knowing state of mind,

substantial economic and injury, and the numerous factors in aggravation. These facts demonstrate Respondent is a danger to the public. He knowingly converted Trust funds and this misconduct adversely reflects on his fitness to practice law. Upon consideration of the ABA *Standards* and Colorado Supreme Court case law, the Hearing Board concludes there is no justification for a sanction short of disbarment.

## VII. *ORDER*

The Hearing Board therefore **ORDERS:**

1. **DEWAYNE DELL RYMER,** Attorney Registration No. 28946, is **DISBARRED** from the practice of law, effective thirty-one (31) days from the date of this order, and his name shall be stricken from the list of attorneys licensed to practice law in the State of Colorado.

2. **DEWAYNE DELL RYMER SHALL** pay restitution to the Trust in the amount of $231,914.76 with credit for any amount he has already paid.

3. **DEWAYNE DELL RYMER SHALL** pay the costs of these proceedings. The People shall submit a Statement of Costs within fifteen (15) days of the date of this order. Respondent shall have ten (10) days within which to respond.