**The PEOPLE of the State of Colorado, Complainant,**

v.

**Clifford G. COZIER, Respondent.**

**No. 02PDJ106.**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Aug. 8, 2003.

** Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3) and § 24–51–1105, C.R.S.2002.

Attorney Regulation. The Hearing Board disbarred Respondent, Clifford G. Cozier, attorney registration number 20550 from the practice of law following a sanctions hearing in this default proceeding. The disciplinary action arose from respondent's handling of three separate estate matters. With regard to two estate matters, respondent was aware of conflicts among the heirs and beneficiaries of the estates but failed to discuss with them any actual or potential conflict of interest in violation of Colo. RPC 1.7(b). In one matter, he induced the heirs to support his appointment as personal representative by representing that he would not charge any fee for his services and thereafter obtained approval from the court for payment of fees. He thus deceived his clients and induced the court to act upon false or misleading information in approving his application for fees in violation of Colo. RPC 8.4(c). Respondent signed closing documents as trustee of the trust when he had not been appointed by the court to serve as trustee, nor had he received any authorization to act in that capacity from his individual clients, and notified third parties that he had been selected to handle administration of the estate in violation of Colo. RPC 8.4(c). In a separate estate matter, respondent negligently converted funds belonging to another client or to a third party in violation of Colo. RPC 8.4(c) and Colo. RPC 1.15(a). With regard to one out-of-state beneficiary, respondent asked a notary public in Colorado to notarize the beneficiary's signature despite his knowledge that neither he nor the notary had witnessed the signature. Respondent then published the signature in violation of Colo. RPC 8.4(a) and Colo. RPC 8.4(c). When the court ordered respondent to turn over trust assets and documents in his possession, respondent knowingly failed to comply with the court order, in violation of Colo. RPC 3.4(c). Respondent knowingly converted funds belonging to a client or a third party, in violation of Colo. RPC 8.4(c). Respondent knowingly failed to respond to demands for information from the Office of Regulation Counsel in violation of Colo. RPC 8.1(b) and Colo. RPC 3.4(c). Respondent was ordered to pay restitution and the costs of the disciplinary proceeding.

Opinion by Presiding Disciplinary Judge, ROGER L. KEITHLEY, and Hearing Board Members, MAUREEN A. CAIN, and MARK D. SULLIVAN, both members of the bar.

## REPORT, DECISION AND IMPOSITION OF SANCTION

### SANCTION IMPOSED: ATTORNEY DISBARRED

A Sanctions Hearing pursuant to C.R.C.P. 251.15(b) was held on June 11, 2003, before the Hearing Board consisting of the Presiding Disciplinary Judge ("PDJ") and two Hearing Board Members, Maureen A. Cain and Mark D. Sullivan, both members of the bar. Gregory G. Sapakoff, Assistant Regulation Counsel, represented the People of the State of Colorado (the "People"). Clifford G. Cozier, the respondent ("Cozier"), did not appear either in person or by counsel.

The People filed a Complaint in this matter on December 18, 2002. The Citation and Complaint were sent via regular and certified mail to Cozier on the same date. The People filed a Proof of Service on December 30, 2002. The Proof of Service shows that the Citation and the Complaint were sent to both Cozier's registered business address and his registered home address, and were signed for by Cozier's agent at his registered busi-

ness address. Cozier failed to file an Answer or otherwise respond to the Complaint.

On January 22, 2003, the People moved for default on the claims set forth in the Complaint. A copy of the Motion for Default was sent to Cozier at his business address. Cozier did not respond to the People's Motion for Default.

On February 21, 2003, the PDJ granted the Motion as to the facts set forth in the Complaint, which were deemed admitted, and the claims set forth in the Complaint, with the exception of claim seven, were deemed established. A copy of the PDJ's Order was sent to Cozier at his business address.

On March 4, 2003, the People sent a Confirmation of Sanctions Hearing to Cozier via certified and regular mail at his registered business address. The Confirmation provided notice to Cozier that the matter was set for a one-half day hearing on June 11, 2003. Notwithstanding the fact that Cozier had sufficient notice of the hearing, he failed to appear.

At the Sanctions Hearing, the People presented no additional testimony or exhibits. The Hearing Board considered the facts established by the entry of default and the People's argument, and made the following findings of fact which were established by clear and convincing evidence.

## I. *FINDINGS OF FACT*

Clifford G. Cozier has taken and subscribed the oath of admission, was admitted to the bar of the Colorado Supreme Court on May 29, 1991, and is registered upon the official records of the Supreme Court, registration number 20550. He is subject to the jurisdiction of this Court pursuant to C.R.C.P. 251.1(b).

All factual allegations set forth in the Complaint were deemed admitted by the entry of default, and therefore are established by clear and convincing evidence. *See* the Complaint attached hereto as Exhibit A. The entry of default also deemed established the violations of the Rules of Professional Conduct set forth therein, except for those alleged in claim seven.

## II. *CONCLUSIONS OF LAW AND IMPOSITION OF SANCTION*

The entry of default established the following violations of the Colorado Rules of Professional Conduct ("Colo.RPC") in this matter: Two violations of Colo. RPC 1.7(b) (conflict of interest); two violations of Colo. RPC 1.15(a) (failure to keep client or third party funds separate from the lawyer's own property); two violations of Colo. RPC 3.4(c) (knowing failure to comply with an obligation under the rules of a tribunal); one violation of Colo. RPC 8.1(b) (failure to respond reasonably to a lawful demand for information from a disciplinary authority); one violation of Colo. RPC 8.4(a) (attempting to violate the rules of professional conduct through the act of another); and five violations of Colo. RPC 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation).

Among the violations of Colo. RPC 8.4(c) are one act of negligent conversion of client or third party funds and one act of knowing conversion of client or third party funds.

In the Caldwell matter, Cozier represented all of the heirs of Thelma Caldwell, individually, and served as personal representative for the decedent's estate. Cozier was aware of conflicts among the heirs but failed to discuss with any of them any actual or potential conflict of interest created by his serving as a fiduciary for the estate and representing all of the heirs in their individual capacities. Even as potential conflicts among Cozier's clients ripened into actual disputes involving the probate assets, Cozier continued to represent all of the individual heirs and the interests of the estate. Cozier's conduct in this regard violated Colo. RPC 1.7(b) (representing a client when the representation may be materially limited by the lawyer's responsibilities to another client or to a third person).

Cozier induced the heirs of Thelma Caldwell to support his appointment as personal representative by representing that he would not charge any fee for his services as personal representative. In the process of closing the decedent's estate, however, Cozier sought and obtained approval from the

court for payment of fees from estate assets which included fees for work Cozier performed as personal representative of Thelma Caldwell's estate. By submitting invoices to the court for approval for services when he knew he was not entitled to compensation, Cozier deceived his clients and induced the court to act upon false or misleading information in approving his application for payment of fees out of estate assets. Cozier's conduct in this regard violated Colo. RPC 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation).

■ Cozier also attended a closing with respect to the sale of decedent's real estate and signed closing documents as trustee of the Thelma Caldwell revocable trust. At the time, Cozier had not been appointed by the court to serve as trustee, nor had he received any authorization to act in that capacity from his individual clients. By signing documents as trustee of the Thelma Caldwell revocable trust, Cozier made further misrepresentations, in violation of Colo. RPC 8.4(c).

On or about July 6, 2001, Cozier deposited the sum of $53,164.00 belonging to the estate of Jack Zolar into his trust account. Cozier deposited the funds into the trust account in anticipation of paying estate taxes and other administrative fees relating to the Zolar estate. When it came time to pay the estate taxes, Cozier wrote a check drawn on his law firm operating account instead of his trust account.

■ Cozier promptly discovered the mistake and, in an attempt to rectify the mistake, wrote a check drawn on his trust account, payable to himself, in the amount of $56,150.00. At the time the check was written, the total balance in the trust account was $55,416.19. After the check was returned due to insufficient funds, Cozier wrote another check drawn on his trust account, payable to himself, in the amount of $55,000.00. The check cleared, but the amount of the check exceeded the amount of funds on deposit for the Zolar estate. By writing the check to himself for $55,000.00, Cozier converted $1,836.00 of funds belonging to another client or to a third party. The complainant has conceded that it cannot prove by clear and convincing evidence that this conversion was

knowing. Thus, technical or negligent conversion is established in violation of Colo. RPC 8.4(c) and Colo. RPC 1.15(a). *See, People v. Varallo*, 913 P.2d 1, 11 (Colo.1996) (holding that a "technical conversion" is a conversion or misappropriation where the complainant either concedes that the misappropriation was negligent or it cannot be proven by clear and convincing evidence that the conversion was knowing).

Cozier also knowingly failed to respond reasonably to lawful demands for information from the Office of Regulation Counsel concerning the trust account notification matter. Specifically, Cozier failed to provide a written response to the request for investigation concerning the overdraft in his trust account and failed to comply with the Office of Attorney Regulation Counsel's request for further documentation concerning the funds on deposit in his trust account at the time of the overdraft. Cozier had sufficient notice of the request for information from the Office of Attorney Regulation Counsel: the letter sent certified mail was received at Cozier's office and signed for by Dougherty's legal assistant. Cozier's conduct in this regard constitutes a violation of Colo. RPC 8.1(b) (a lawyer in connection with a disciplinary matter shall not knowingly fail to respond reasonably to a lawful demand for information from a disciplinary authority). Cozier also knowingly failed to comply with his obligations under the rules of a tribunal, in violation of Colo. RPC 3.4(c). Specifically, Cozier failed to comply with his obligations under C.R.C.P. 251.5(d) (failure to respond without good cause shown to a request by Attorney Regulation Counsel) and Colo. RPC 8.1(b).

In the Glasgow/Estate of Rohn Matter, Cozier was initially retained by Lora Larson ("Larson") to represent her in her capacity as a beneficiary of the revocable trust of John Rohn, who died in September 2001. After entering into an attorney-client relationship with Larson, Cozier sought to have the existing trustee of the Rohn trust removed and to have himself appointed as successor trustee. In doing so, Cozier sought Larson's support and the other beneficiaries of the trust without disclosing to or discussing with any of them the implications or risks

involved in having Cozier serve as successor trustee while representing Larson individually.

Cozier effectively took control of the Rohn trust in September 2001, and assumed the role of trustee after obtaining the support of a majority of the trust beneficiaries. Shortly after declaring himself to be successor trustee of the Rohn trust, Cozier wrote and signed a check payable to himself drawn on the decedent's checking account at U.S. Bank. The check was for Cozier's fees charged for representing Larson individually from September 10, 2001, through October 10, 2001.

 Cozier's representation of Larson may have been materially limited by Cozier's duties as purported trustee of the Rohn trust. Accordingly, Cozier was obligated to fully disclose that conflict to his client. Colo. RPC 1.7(b)(2). *See, also, In re Cimino*, 3 P.3d 398, 399–400 (Colo.2000) (lawyer suspended for failing to disclose conflict of interest to client). Cozier's representation of Larson and his obligations as purported trustee of the Rohn trust were also materially limited by his own interests in obtaining control of the Rohn trust assets. *See, People v. Henderson*, 967 P.2d 1038, 1040 (Colo. 1998) (lawyer's ability to represent his client in bankruptcy was materially limited by his own interest as a creditor in collecting attorney fees). Through this conduct, Cozier violated Colo. RPC 1.7(b), even if no actual injury resulted from the conflict of interest. *See, Cimino*, 3 P.3d at 401 (stating that "[t]he absence of injury does not negate the violations of Colo. RPC 1.7(b) or 1.8(a)").

In seeking to have himself appointed as trustee of the Rohn trust, Cozier sent nomination forms to most of the trust beneficiaries. · The forms required the notarized signature of the designated beneficiary. One of those beneficiaries, Beatrice Lobland, resided in Minnesota. Lobland apparently signed a form prepared by Cozier in Minnesota and returned it to Cozier without notarization. After Cozier received the form from Lobland, he asked a notary public in his office suite in Colorado to notarize the signature, despite his knowledge that neither he nor the notary had witnessed the signature. The notary complied with Cozier's request based upon his advice that she was permitted to notarize the signature.

By notarizing Lobland's signature, the notary verified that Lobland had appeared and signed the document before her and that the notary was able to verify Lobland's identity. Cozier published the document containing the false representations to others, including the probate court, intending that they rely upon the misrepresentation of the notary. By making a misrepresentation through the conduct of the notary, Cozier violated Colo. RPC 8.4(a) (it is professional misconduct for a lawyer to violate or attempt to violate the rules of professional conduct through the act of another). By publishing the improperly notarized documents, Cozier violated Colo. RPC 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation). *See, People v. Mitchell*, 969 P.2d 662 (Colo.1998) (attorney violated Colo. RPC 8.4(c) by submitting a false statement to the small business administration for the purpose of obtaining a loan).

Cozier engaged in further acts in violation of Colo. RPC 8.4(c) through his misrepresentations to the former trustee of the Rohn trust and to representatives of U.S. Bank. On September 21, 2001, Cozier sent a letter to Gary Glasgow, the original trustee of the Rohn trust, advising that Cozier had been retained by Lora Larson "as well as the majority of the beneficiaries of Mr. Rohn's revocable trust with respect to the administration of Mr. Rohn's trust and his estate." The statement was false. Cozier had not been retained by any of the beneficiaries in their individual capacity other than Larson. Furthermore, Cozier had not been retained by anyone with respect to administration of Mr. Rohn's probate estate.

Also on September 21, 2001, Cozier sent a letter to Karen Barber at U.S. Bank, concerning Mr. Rohn's bank account. In the letter, Cozier falsely represented to U.S. Bank that he represented the beneficiaries of the estate of John Rohn, including the majority of the beneficiaries of the Rohn trust. Cozier made representations in order to gain control of Mr. Rohn's trust asset, some of

which he then used to pay himself for work he had done for Larson, individually.

■ In November 2001, the Arapahoe County District Court entered an order granting a motion for preliminary injunction to restrain Cozier from acting as trustee from the Rohn trust. The order also directed Cozier to turn over to Mr. Glasgow any trust assets in his possession and any documents in his possession relating to the Rohn trust. Pursuant to the court's order, Cozier was obligated to restore to the Rohn trust the funds he had paid to himself out of the trust assets. Cozier knowingly failed to comply with the court order, in violation of Colo. RPC 3.4(c) (a lawyer shall not knowingly fail to comply with an obligation under the rules of a tribunal). *See also, People v. Huntzinger*, 967 P.2d 160, 162 (Colo.1998) (lawyer suspended for failure to pay court-ordered attorney fees, in violation of Colo. RPC 3.4(c)).

■ Since receiving the order of the Arapahoe County District Court, dated November 5, 2001, Cozier has continued to exercise unauthorized dominion or ownership of assets belonging to the Rohn trust or the Rohn estate. Through this continuing conduct, Cozier knowingly converted funds belonging to a client or a third party, in violation of Colo. RPC 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation). *See, Varallo, supra* (holding that knowing misappropriation (for which the lawyer is almost invariably disbarred) "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking"). In Colorado, misappropriating funds belonging to a third party is no less egregious than conversion of client funds. *See, e.g., People v. Guyerson*, 898 P.2d 1062, 1063 (Colo.1995) (lawyer disbarred for converting funds from a law firm in which he was a partner, including some funds belonging to clients); *People v. Nulan*, 820 P.2d 1117, 1119 (Colo.1991) (finding conversion even though escrowed funds held by the lawyer were the property of persons who were not clients of the lawyer).

Certainly after the issuance of the Arapahoe County District Court's order of November 5, 2001, Cozier knew the funds he paid to himself out of the Rohn trust assets did not belong to him and that he was not authorized to retain the funds. Notwithstanding that knowledge, after receiving the court order and a demand for the return of the funds from the trustee of the Rohn trust, Cozier continued to retain control of the funds.

■ The ABA *Standards for Imposing Lawyer Sanctions* (1991 and Supp.1992) ("ABA *Standards* ") are the guiding authority for selecting the appropriate sanction to oppose for lawyer misconduct. *In re Roose*, 69 P.3d 43, 47 (Colo.2003), *modified, reh'g denied.*

ABA *Standards* § 4.11 provides:

Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.

■ Cozier's knowing conversion of funds in the Glasgow/Estate of Rohn matter meets the criteria for disbarment under ABA *Standard* § 4.11. Colorado case law is consistent with the ABA *Standards* in holding that disbarment is the presumed sanction for knowing conversion of the property of another. *Varallo, supra. See also, People v. Wiedman*, 36 P.3d 785, 788 (Colo.O.P.D.J. 1999) (holding that a lawyer's knowing misappropriation of funds, whether belonging to a client or a third party, warrants disbarment except in the presence of extraordinary factors in mitigation).

In *Varallo, supra*, 913 P.2d 1, 11, the Colorado Supreme Court stated as follows:

A "technical conversion," usually warranting suspension rather than disbarment, is a conversion or misappropriation where the complainant either concedes that the misappropriation was negligent, *People v. Dickinson*, 903 P.2d 1132, 1138 (Colo.1995), or it cannot be proven by clear and convincing evidence that the respondent knowingly converted the funds, *People v. Galindo*, 884 P.2d 1109, 1112 (Colo.1994) (board's conclusion that conversion was negligent rather than knowing was supported by the record and would not be

overturned); *People v. Wechsler,* 854 P.2d 217, 220–21 (Colo.1993) (supreme court will not overturn hearing board's conclusion that intentional conversion was not established by clear and convincing evidence unless there is no substantial evidence in the record to support conclusion); *McGrath,* 780 P.2d at 493 ("Indeed, if there were not some lingering doubt about whether the respondent engaged in *knowing* conversion of his client's funds, we would have no hesitation in entering an order of disbarment.")

Cozier's conduct in negligently or technically converting funds in the trust account notification matter is, in and of itself, grounds for suspension from the practice of law. *See, e.g., People v. Wechsler,* 854 P.2d 217, 223 (Colo.1993) (lawyer suspended for one year and one day for technical or negligent conversion of funds coupled with other misconduct).

ABA *Standard* § 6.22 provides:

Suspension is generally appropriate when a lawyer knowingly violates a court order or rule, and there is injury or potential injury to a client or a party, or interference or potential interference with a legal proceeding.

Pursuant to ABA *Standard* § 6.22, Cozier's conduct in knowingly violating court orders or rules in two instances would generally warrant a suspension from the practice of law. In the instant case, the sanction of disbarment is reinforced by Cozier's knowing violation of court orders and rules; his additional instances of misconduct involving dishonesty, fraud, deceit or misrepresentation; and his conflicted representations.

Aggravating factors in the instant case include prior discipline in the form of a private admonition in 2000, ABA *Standard* § 9.22(a); a dishonest or selfish motive, *see id.* at § 9.22(b); multiple offenses, *see id.* at § 9.22(d); failure to cooperate in disciplinary proceedings, *see id.* at § 9.22(e); and substantial experience in the practice of law, *see id.* at § 9.22(i). Cozier has not submitted evidence of any factors in mitigation.

The Hearing Board further finds that restitution is warranted. The entry of default established that Cozier billed the Caldwell estate over $10,000 for his services contrary to his earlier representations to his clients, a significant portion of his fees were billed for work Cozier performed as personal representative of the estate and/or for tasks within the scope of the duties and responsibilities of a personal representative. Cozier induced the heirs to support his appointment as personal representative of the estate based, at least in part, on Cozier's representation that he would not charge any fee for his services as personal representative. The amount Cozier charged was contrary to the fee agreement. The estate is owed not less than $10,000.

Additionally, the entry of default has established that shortly after declaring himself to be successor trustee of the Rohn trust, Cozier wrote and signed a check payable to himself drawn on Mr. Rohn's checking account at U.S. Bank in the amount of $12,319.50. The withdrawal was for payment of Cozier's fees in representing Larson from September 10, 2001 through October 10, 2001. A portion of the time for which Cozier billed Larson and for which he paid himself from Rohn's account was spent researching and consulting with other attorneys concerning Cozier's own conflict of interest. Substantial additional time was billed by Cozier for time spent in his efforts to have himself appointed as successor trustee of the Rohn trust. In seeking to have himself appointed as successor trustee of the Rohn trust, Cozier was acting for his own benefit and not for the benefit of his client, Larson, or for the trust. Consequently, Cozier's withdrawal of the $12,319.50 from the account was not authorized under his fee agreement and must be returned.[1]

### III. *ORDER*

It is therefore ORDERED:

1. CLIFFORD G. COZIER, attorney registration 20550, is DISBARRED from the practice of law effective thirty-one days from the date of this order, and his name shall be

---

1. US Bank covered the loss to the account by the       unauthorized withdrawal.

stricken from the roll of attorneys licensed to practice law in this state.

2. Cozier is Ordered to pay the costs of these proceedings within sixty (60) days of the date of this order. The People shall submit a Statement of Costs within ten (10) days of the date of this Order. Cozier shall have five (5) days thereafter to submit a response thereto.

3. Within ninety (90) days from the date of this Order, Cozier shall pay $10,000 to the personal representative of the Caldwell Estate in restitution to the Estate plus interest from the date of this Order, and $12,319.50 to U.S. Bank plus interest at eight percent from October 12, 2001 as restitution for the check written on that date.

## EXHIBIT A

Gregory G. Sapakoff, # 16184, Assistant Regulation Counsel, John S. Gleason, # 15011 Regulation Counsel, Attorneys for Complainant, 600 17th Street, Suite 200–South Denver, Colorado 80202.

## COMPLAINT

THIS COMPLAINT is filed pursuant to the authority of C.R.C.P. 251.9 through 251.14, and it is alleged as follows:

### Jurisdiction

1. The respondent has taken and subscribed the oath of admission, was admitted to the bar of this court on May 29, 1991, and is registered upon the official records of this court, registration no. 20550. He is subject to the jurisdiction of this court in these disciplinary proceedings. The respondent's registered business address is 7430 E. Caley Ave., Suite 100, Englewood, Colorado 80111. The respondent's registered home address is 7600 E. Caley Ave., # 218, Englewood, Colorado 80111.

### Caldwell Matter
### CLAIM I

[Conflict of Interest—Colo. RPC 1.7(b) ]

2. Thelma Caldwell died on February 24, 2000. During her lifetime, she had executed a will and a revocable trust, both prepared by the respondent.

3. In approximately late February 2000, Rose Sanford, one of Thelma Caldwell's children, contacted the respondent with questions about the probate process and Thelma Caldwell's estate. At that time, Ms. Sanford informed the respondent that there were significant conflicts and disputes among some of Thelma Caldwell's children, all of whom were the heirs of her estate and designated as beneficiaries of the trust (hereinafter referred to collectively as the "heirs").

4. Pursuant to Thelma Caldwell's last will and testament, Gregory Caldwell and Patricia Hill, two of the heirs, were to serve as co-personal representatives of the estate. If neither of them were able or willing to act as personal representative, then the will designated Gloria Olivier, another of the heirs, to serve as personal representative.

5. The trust documents executed by the decedent designated Rose Sanford to serve as trustee of the Thelma Caldwell revocable trust.

6. In March of 2000, after the initial contact with Rose Sanford, the respondent met with several of the heirs and proposed an arrangement whereby he would represent all of the heirs in their individual capacities. The respondent further proposed that he be appointed personal representative of the estate as a means of alleviating the conflict among some of the heirs.

7. In proposing the representation and fiduciary appointment as described above, the respondent did not discuss with the heirs, all of whom are adults, any actual or potential conflict of interest created by the respondent serving as fiduciary for the estate and representing all of the heirs in their individual capacities.

8. In seeking to induce the heirs to appoint him as personal representative of the decedent's estate, the respondent offered to waive any fee for serving as personal representative if he was also retained by all of the heirs to represent them in their individual capacities.

9. Some of the heirs agreed to the respondent's appointment as personal repre-

sentative in reliance upon his offer to waive any fee for serving in that capacity.

10. In approximately March 2000, all of the heirs signed, in counterparts, a written fee agreement retaining the respondent to represent them in their individual capacities. Accordingly, an attorney-client relationship was formed between the respondent and each of the heirs individually. Neither that fee agreement nor any other fee agreement or written memorialization provides for the payment of any fee to the respondent for serving as personal representative or for serving in any fiduciary capacity with respect to the Thelma Caldwell revocable trust.

11. In April 2000, the respondent filed with the probate court for the City and County of Denver an application for informal probate of the decedent's will and for informal appointment of himself as personal representative.

12. Shortly after the respondent filed his application, the respondent was appointed as personal representative of the decedent's estate.

13. As early as March of 2000, conflicts arose between Gregory Caldwell and both the respondent and some of the other heirs concerning estate-related matters. These conflicts included issues about whether Mr. Caldwell was entitled to additional estate assets because of his role in caring for his mother and her home late in her life, and Mr. Caldwell's concerns about the respondent's efforts to sell the decedent's home, which was the principal asset of the estate. In addition to these conflicts, the animosity between Gregory Caldwell and one of his sisters became so severe that a restraining order was sought by one of them.

14. The respondent was aware of all of these conflicts between and among the heirs.

15. In December 2000, Gregory Caldwell wrote a letter to the probate court voicing his complaints and concerns about the respondent and the respondent's handling of estate administration matters. The respondent received a copy of the letter.

16. Despite the actual conflict and disagreements among the heirs and between Gregory Caldwell and the respondent, the respondent continued to represent all of the heirs, and continued to serve as personal representative of the decedent's estate throughout the estate administration process.

17. Later during the estate administration process, the respondent also acted, without authority, as trustee of the Thelma Caldwell revocable trust.

18. In both his capacity as personal representative of the decedent's estate, and as trustee for the decedent's revocable trust, the respondent had fiduciary obligations including, but not limited to, those defined and set forth in the Uniform Fiduciaries Law, C.R.S. § 15–1–101, et. seq., and further duties and obligations as provided under Colorado law, including, but not limited to, those set forth at C.R.S. § 15–12–701, et seq.

19. As attorney for each of the individual heirs of the decedent's estate, the respondent also had a duty of loyalty to each of the heirs, individually.

20. Pursuant to Colo. RPC 1.7(b), a lawyer shall not represent a client if representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless the lawyer reasonably believes the representation will not be adversely affected and the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

21. In representing all of the heirs of the decedent's estate and beneficiaries of the decedent's revocable trust, the respondent represented clients under circumstances in which his representation may have been materially limited by the respondent's responsibilities to the other heirs as clients, by his fiduciary responsibilities to the estate and the trust, and by his own interests.

22. In seeking his client's consent to the representation of all of the heirs, in addition to serving in his fiduciary capacities, the respondent did not consult with his individual

clients as provided for and defined in Colo. RPC 1.7(b)(2).

23. Through his conduct as described above, the respondent engaged in a conflict of interest, in violation of Colo. RPC 1.7(b).

24. The respondent's conflicted representation caused harm or potential harm to his individual clients.

WHEREFORE, the complainant prays at the conclusion hereof.

## CLAIM II

### [Conduct involving dishonesty, fraud, deceit or misrepresentation— Colo. RPC 8.4(c) ]

25. Paragraphs 1 through 22 are incorporated herein as if fully set forth.

26. The decedent's estate consisted of assets valued at slightly over $200,000.00. The most significant asset was the decedent's home, the sale of which netted $157,937.81. The decedent also had bonds purchased through Norwest and Metlife worth approximately $46,000.00 at the time of her death.

27. By operation of the estate plan created by the respondent, the decedent's entire residuary estate was to pour over into the Thelma Caldwell revocable trust to be distributed to the various beneficiaries through the trust. Through this process, the decedent's home became an asset of the trust and had to be conveyed by the trustee.

28. Pursuant to the provisions of the estate plan prepared by the respondent, Rose Sanford was designated to serve as trustee of the Thelma Caldwell revocable trust.

29. The respondent never took any steps, in either his capacity as personal representative of the estate or in his capacity as Rose Sanford's attorney, to have her appointed as trustee.

30. At the time the closing with respect to the sale of the decedent's real estate was to take place, no one had been appointed by the court as trustee of the Thelma Caldwell trust.

31. The respondent attended the closing with respect to the sale of the decedent's real estate and signed all of the closing documents as trustee of the Thelma Caldwell revocable trust.

32. At the time the respondent executed the closing documents, the respondent had not been appointed by the court to serve as trustee, nor had he received any other authorization to act in that capacity.

33. At the time of the closing with respect to the sale of the decedent's real estate, the respondent knew, or should have known, that he had not been appointed by the court to serve as trustee of the Thelma Caldwell revocable trust and that he did not have authority to sign closing documents in that capacity.

34. On May 16, 2001, the respondent attended a hearing before Denver Probate Court Magistrate Sandra Franklin. At the hearing, the respondent acknowledged that he had signed all of the closing documents as trustee of the Thelma Caldwell revocable trust when, in fact, he had never been appointed in that capacity.

35. In signing closing documents as personal representative of the Thelma Caldwell revocable trust, the respondent made material factual representations that he was, in fact, the trustee. The respondent's representations in this regard were false.

36. The respondent knew, or should have known, that his representations concerning his status as trustee were false.

37. The respondent made representations concerning his status as trustee with the intent that all parties involved in the closing rely upon his representations.

38. All parties involved in the closing with respect to the sale of the decedent's real estate reasonably relied upon the representations of the respondent that he was authorized to act as trustee and was, therefore, empowered to convey the subject real estate.

39. As a result of the respondent's misrepresentations as described above, the validity of the closing concerning the decedent's real estate was threatened.

40. At the hearing held on May 16, 2001, the trust beneficiaries agreed to ratify the respondent's actions in order to avoid the

possible rescission of the sale of the decedent's real property.

41. But for the agreement to ratify the respondent's actions in assuming the authority of trustee of the Thelma Caldwell revocable trust, the trust and its beneficiaries could have suffered significant harm.

42. Through his conduct as described above in relation to the sale of the decedent's real estate, the respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, which caused harm or potential harm to the trust and to the trust beneficiaries.

43. In the process of closing the decedent's estate, the respondent sought and obtained approval for payment of all of his fees from estate or trust assets.

44. The respondent billed the estate over $10,000.00 for his services and, contrary to his earlier representations to his clients, a significant portion of his fees were billed for work the respondent performed as personal representative of the estate and/or for tasks within the scope of the duties and responsibilities of a personal representative as provided under Colorado law, including C.R.S. § 15–12–701, *et seq.*

45. The respondent induced the heirs to support the respondent's appointment as personal representative of the estate based, at least in part, on the respondent's representation that he would not charge any fee for his services as personal representative.

46. By submitting billing statements for his services, the respondent impliedly represented that such charges were for services as counsel for the individual heirs and not for services as personal representative. This representation was false.

47. By submitting his invoices to the court and seeking compensation for the invoices as expenses of estate administration, the respondent also impliedly represented to the court that all such fees were in accordance with the agreement pursuant to which he had been retained. This representation was false.

48. The respondent knew that he was not authorized to bill for services as personal representative at the time he submitted these invoices.

49. Through his conduct as described above, the respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, by deceiving his clients and by inducing the court to act upon false or misleading information in approving his application for payment of fees out of estate assets.

50. Through the respondent's conduct as described above, the respondent caused harm to the decedent's estate and to his individual clients by obtaining from the estate payment for services the respondent represented would be provided without any fee.

51. Through his conduct as described above, the respondent violated Colo. RPC 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation).

WHEREFORE, the complainant prays at the conclusion hereof.

### Trust Account Notification Matter
### CLAIM III

**[Failure to keep client or third party funds separate from the lawyer's own property and negligent conversion of client or third party funds—Colo. RPC 1.15(a) and Colo. RPC 8.4(c) ]**

52. In approximately March of 2000, the respondent was retained by Marricorine Tabor to administer the estate of her father, Jack Zolar, who died in approximately March of 2000. Accordingly, an attorney-client relationship between the respondent and Ms. Tabor was formed. The respondent also assumed fiduciary duties with respect to the estate.

53. As part of the estate administration process, the respondent opened a fiduciary bank account in the name of the Estate of Jack A. Zolar at First Bank of Cherry Creek (the "Zolar account").

54. The respondent deposited into the Zolar account only funds belonging to the Zolar estate.

55. The respondent was the only person with signatory power on the Zolar account.

56. On or about July 6, 2001, the respondent wrote a check drawn on the Zolar account in the amount of $53,164.00, payable to the Cliff Cozier COLTAF Account (the "COLTAF account"). On or about the same day, the respondent deposited the check into the COLTAF account.

57. At the end of July 2001, the balance in the COLTAF account was $68,416.19. According to the respondent, all of the funds in the COLTAF account as of July 31, 2001, other than the funds deposited to the account from the Zolar account, were funds the respondent received in connection with his representation of a client in a real estate matter known as the "Flynn–Fabrizio matter."

58. The funds in the COLTAF account in relation to the Flynn–Fabrizio matter belonged to the respondent's client or to a third party at the time they were originally deposited into the COLTAF account.

59. The respondent deposited the funds from the Zolar account into the COLTAF account in anticipation of paying estate taxes and other administrative fees relating to the Zolar estate.

60. In late September 2001, the respondent completed the estate tax returns for the Zolar estate and directed his legal assistant to prepare checks for his signature to pay those taxes.

61. The respondent's legal assistant prepared checks for the respondent's signature from the respondent's operating account instead of the COLTAF account. The respondent signed the checks without noticing the account on which they were drawn.

62. Within approximately one day, the respondent discovered the mistake concerning the checks and, in an attempt to rectify the mistake, wrote check number 617, drawn on his COLTAF account, in the amount of $56,150.00, payable to himself. The check was intended to cover the total expenditures the respondent had made on behalf of the Zolar estate out of his operating account.

63. The respondent took no steps to determine the balance in the COLTAF account at the time he wrote check number 617.

64. On or about September 25, 2001, check number 617 was presented for payment at First Bank of Cherry Creek and was returned unpaid due to insufficient funds. At the time, the total balance in the COLTAF account was $55,416.19.

65. At the time check number 617 was presented for payment at First Bank of Cherry Creek, the respondent had only $53,164.00 in the COLTAF account belonging to the Zolar estate. All other funds in the account belonged to the respondent's client or to a third party in regard to the respondent's representation of a client in the Flynn–Fabrizio matter.

66. First Bank of Cherry Creek notified the respondent and Regulation Counsel promptly of the overdraft in the COLTAF account.

67. After the respondent learned that check number 617 had not cleared due to insufficient funds, he wrote check number 618 drawn on the COLTAF account, dated September 27, 2001, in the amount of $55,000.00. The check was made payable to the respondent.

68. At the time the respondent wrote check number 618 as described above, he still had only $53,164.00 on deposit in the COLTAF account from the Zolar estate. The balance of the funds in the account belonged to the respondent's client or to a third party in connection with the respondent's representation of a client in the Flynn–Fabrizio matter.

69. Check number 618 cleared the COLTAF account on September 27, 2001, leaving a balance of $416.19 in the COLTAF account.

70. By writing check number 618 to himself for $55,000.00, the respondent used $1,836.00 of funds belonging to his client or to a third party in regard to the Flynn–Fabrizio matter to reimburse himself for expenses he had paid for the Zolar estate.

71. The respondent did not have the consent of his client or anyone else in a position of authority to use any of the funds he received in connection with the Flynn–Fabrizio matter for such purposes.

72. By using funds belonging to a client or a third party in relation to the Flynn–Fabrizio matter, the respondent exercised unauthorized dominion or ownership over funds of a client or third party.

73. Through his conduct as described above, the respondent knowingly and/or negligently converted or misappropriated funds belonging to a client or a third party.

74. By paying these client or third party funds to himself and removing them from the COLTAF account, the respondent also failed to keep client or third party funds separate from his own property.

75. Through his conduct as described above, the respondent violated Colo. RPC 1.15(a) (in connection with a representation, an attorney shall hold property of clients or third persons that is in an attorney's possession separate from the attorney's own property) and Colo. RPC 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation).

WHEREFORE, the complainant prays at the conclusion hereof.

### CLAIM IV

**[Failure to keep client or third party funds separate from the attorney's own property in a trust account—Colo. RPC 1.15(a) ]**

76. Paragraphs 52 through 74 are incorporated herein as if fully set forth.

77. In the alternative, if it is proven that the respondent had earned all of the funds he received in connection with representation of a client in the Flynn–Fabrizio matter as described above prior to September 27, 2001, then those funds constituted the respondent's own property. Under such circumstances, the respondent commingled funds belonging to the estate of Zolar with his own property in the COLTAF account.

78. Pursuant to Colo. RPC 1.15(a), the respondent is required to hold property of clients or third persons that is in his possession separate from his own property.

79. By commingling property belonging to the estate of Zolar with his own property in the COLTAF account, the respondent failed, in connection with the representation, to hold property of clients or third persons in his possession separate from his own property.

80. Through his conduct as described above, in the alternative, the respondent violated Colo. RPC 1.15(a) (in connection with a representation, an attorney shall hold property of clients or third persons that is in the attorney's possession separate from the attorney's own property).

WHEREFORE, the complainant prays at the conclusion hereof.

### CLAIM V

**[Failure to respond reasonably to lawful demands for information from a disciplinary authority—Colo. RPC 8.1(b) and Colo. RPC 3.4(c) ]**

81. Paragraphs 52 through 79 are incorporated herein as if fully set forth.

82. On October 4, 2001, Karen L. Bershenyi, investigator for the Office of Attorney Regulation Counsel, sent a letter to the respondent requesting an explanation of the overdraft in the COLTAF account which occurred in September 2001, and also requesting specific accounting documents and information.

83. The respondent received the letter from Ms. Bershenyi and failed to respond to it.

84. On November 27, 2001, Regulation Counsel sent a letter to the respondent by certified mail advising him that an investigation had been initiated based upon the overdraft notification and the respondent's failure to respond to prior requests for information from Ms. Bershenyi. The letter further advised the respondent of his obligation to respond, in writing, within 20 days of his receipt of the letter.

85. The November 27, 2001 letter from Regulation Counsel was received at the respondent's office and signed for by the respondent's legal assistant on November 28, 2001.

86. The respondent personally received the letter dated November 27, 2001, and was aware of his obligation to respond to the request for investigation.

87. The respondent failed to respond to the letter dated November 27, 2001.

88. As of April 2002, the respondent had not responded to any requests for information from Regulation Counsel concerning the trust account notification matter. Accordingly, Regulation Counsel scheduled an investigative deposition and had the respondent served with a subpoena *duces tecum* to appear on April 16, 2002.

89. The subpoena was served upon the respondent personally and, on April 16, 2002, the respondent appeared at the Office of Attorney Regulation Counsel and requested that the deposition be rescheduled so he could retain counsel. The respondent also indicated on that date, on the record, that the records he needed to respond to the issues raised concerning the Zolar estate were in storage and that he would have to retrieve those documents.

90. Pursuant to the respondent's request, Regulation Counsel agreed to reschedule the deposition until after the respondent had retained counsel.

91. Subsequently, Regulation Counsel was notified that the respondent had retained Alexander R. Rothrock, Esq., to represent him regarding all pending investigations.

92. On June 25, 2002, the respondent and Mr. Rothrock met with Regulation Counsel. At that time, the respondent did not provide a written response concerning the trust account notification matter, and indicated that he had not yet retrieved his records concerning the Zolar estate matter from storage.

93. On August 6, 2002, Mr. Rothrock notified Regulation Counsel that he was withdrawing from representation of the respondent.

94. As of September 2002, the respondent had provided no written response to the request for investigation concerning the trust account notification matter, and had failed to provide any of the documents requested by Regulation Counsel relating to that matter. Accordingly, Regulation Counsel had the respondent served with another notice to take his deposition along with a subpoena *duces tecum*.

95. On September 30, 2002, the respondent appeared in the Office of Attorney Regulation Counsel pursuant to the subpoena served upon him personally. On that date, the respondent answered questions concerning the trust account notification matter for the first time.

96. On September 30, 2002, the respondent failed to produce all documents requested in the subpoena *duces tecum* served upon him for purposes of the deposition.

97. During his deposition on September 30, 2002, the respondent mentioned, for the first time, the Flynn–Fabrizio matter, and speculated about his handling of funds received in connection with that matter.

98. During his deposition on September 30, 2002, the respondent was also asked to provide billing records and other documents to account for all of the funds in his COLTAF account during the period of time the funds from the Zolar estate were held in the COLTAF account as described above. This request specifically included billing records concerning the Flynn–Fabrizio matter.

99. Since September 30, 2002, the respondent has not provided any further information or documents requested by Regulation Counsel.

100. Pursuant to Colo. RPC 8.1(b), a lawyer in connection with a disciplinary matter shall not knowingly fail to respond reasonably to a lawful demand for information from a disciplinary authority, except that the rule does not require disclosure of information otherwise protected by Colo. RPC 1.6 or prohibit a good faith challenge to the demand for such information.

101. Through his conduct as described above, the respondent has knowingly failed to respond reasonably to lawful demands for information from Regulation Counsel concerning this matter.

102. Respondent has never raised any challenge pursuant to Colo. RPC 1.6 or any other grounds as a basis for failing to comply with demands for information from Regulation Counsel.

103. Pursuant to C.R.C.P. 251.5(d), a lawyer's failure to respond without good cause shown to a request by Regulation Counsel in the performance of Regulation Counsel's duties, constitutes grounds for discipline.

104. Through his conduct as described above, the respondent has failed to respond, without good cause shown, to numerous requests made by Regulation Counsel in the performance of Regulation Counsel's duties.

105. Through his conduct as described above, the respondent has knowingly failed to comply with obligations under the rules of a tribunal, and specifically those provided in C.R.C.P. 251.5(d) and Colo. RPC 8.1(b) concerning cooperation with Regulation Counsel in connection with a disciplinary investigation.

106. Through his conduct as described above, the respondent has violated Colo. RPC 8.1(b) (a lawyer in connection with a disciplinary matter shall not knowingly fail to respond reasonably to a lawful demand for information from a disciplinary authority) and Colo. RPC 3.4(c) (a lawyer shall not knowingly disobey an obligation under the rules of a tribunal).

WHEREFORE, the complainant prays at the conclusion hereof.

### The Glasgow/Estate of Rohn Matter
### CLAIM VI

**[Conflict of interest—Colo. RPC 1.7(b) ]**

107. Prior to his death on September 9, 2001, John Rohn executed estate planning documents, including a revocable trust, prepared by Gary Glasgow, Esq. As part of the estate plan, substantially all of Mr. Rohn's assets were to be distributed through the revocable trust (the "Rohn trust").

108. Mr. Rohn designated attorney Glasgow to serve as his successor trustee upon Mr. Rohn's death.

109. Upon Mr. Rohn's death, attorney Glasgow began acting as successor trustee of the Rohn trust, and commenced estate proceedings in Arapahoe County District Court.

110. Shortly after Mr. Rohn's death, Lora Larson, with whom Mr. Rohn lived for several years prior to his death, consulted with the respondent concerning Mr. Rohn's estate planning documents.

111. Ms. Larson, who was listed by Mr. Rohn as a beneficiary of the Rohn trust, took the estate planning documents to the respondent and asked the respondent to explain the documents to her. Ms. Larson also expressed to the respondent her concerns about attorney Glasgow, whom she did not trust to serve as trustee for the Rohn trust.

112. On or about September 13, 2001, the respondent entered into a written fee agreement with Ms. Larson, pursuant to which the respondent was to be paid an hourly rate of $140.00 per hour, plus a contingency fee of "one-tenth (10%) of the gross recovery to the beneficiaries of Mr. Rohn's estate." At the time the respondent entered into the fee agreement with Ms. Larson, he was representing Ms. Larson only and had not been retained by anyone to represent or administer Mr. Rohn's estate or to represent anyone who had been appointed or designated to serve in a fiduciary capacity with respect to the Rohn estate.

113. Ms. Larson was one of several persons and entities named as beneficiaries in Mr. Rohn's estate planning documents.

114. After entering into the fee agreement with Ms. Larson, the respondent sought to have attorney Glasgow removed as trustee of the Rohn trust, pursuant to a provision in the trust documents allowing removal of any trustee based upon a majority vote of the trust beneficiaries if the trustee had been "grossly negligent."

115. The respondent concluded that attorney Glasgow had been grossly negligent and communicated this opinion to most of the beneficiaries of the Rohn trust based upon rumors and hearsay statements from some of the beneficiaries and based upon his own disagreement with some aspects of the estate plan created by attorney Glasgow.

116. In approximately September 2001, the respondent contacted, by telephone or in person, most of the beneficiaries designated in the trust documents to receive property from the Rohn trust.

117. While trying to convince the beneficiaries that attorney Glasgow should be removed as trustee from the Rohn trust, the respondent also urged the beneficiaries to have the respondent appointed as successor trustee.

118. The respondent prepared and sent to a majority of the beneficiaries a form for nomination of successor trustee, stating the beneficiaries' desire to have attorney Glasgow removed as successor trustee and voting to have the respondent appointed as successor trustee. Each of the nomination forms was in the form of a pleading to be filed in estate proceedings in the probate court for the City and County of Denver.

119. The forms sent by the respondent to the beneficiaries of the Rohn trust were to be signed before a notary public and returned to the respondent.

120. Based upon their conversations with the respondent, a majority of the beneficiaries executed the forms provided by the respondent.

121. On approximately September 19, 2001, the respondent met with Patrick Malmay and his wife concerning the Rohn estate.

122. Mr. Malmay was designated as a beneficiary in the trust documents. Specifically, Mr. Malmay was to receive the home owned by Mr. Rohn at the time of his death.

123. During his meeting with the Malmays, the respondent represented that he was in possession of documents, including hand-written letters, suggesting that Mr. Rohn had intended for Ms. Larson to have the house. The respondent told the Malmays he would contest, on Ms. Larson's behalf, the estate plan established by attorney Glasgow and that it would cost the Malmays anywhere from $20,000.00 to $90,000.00 to litigate the issue of who gets the house.

124. As an alternative to litigation, the respondent suggested to the Malmays that if attorney Glasgow was removed as trustee and the respondent appointed in his place, the respondent could rework the estate with everyone's cooperation to limit any estate taxes so that everyone would be made whole.

125. The respondent also told the Malmays that if they cooperated with him, "I will bend over backwards to make sure that Lora meets you halfway."

126. In his discussions with the Malmays, the respondent acknowledged that he had a conflict of interest in working for both Mr. Malmay and Lora Larson because of their competing claims to Mr. Rohn's house.

127. The respondent advised the Malmays that the conflict of interest was waiveable and would not be a problem because he could rework the estate to everyone's advantage.

128. In discussing his conflict of interest with the Malmays, the respondent proposed a common representation without explaining the implications of the common representation and the risks involved. He also did not explain the implications or risks involved in the respondent serving as successor trustee while representing Ms. Larson individually.

129. In seeking the support from the other beneficiaries of the Rohn trust for his appointment as successor trustee, the respondent did not disclose or discuss any conflict of interest.

130. The respondent did not discuss with his existing client, Ms. Larson, any conflict of interest involved in his becoming trustee of the Rohn trust, or representing other beneficiaries such as Malmay, while representing Ms. Larson individually.

131. Among the beneficiaries designated in the trust documents to receive distributions from the Rohn trust were three charities. The charities were to receive specific distributions, and were to receive any and all funds that remained in Mr. Rohn's estate after payment of all taxes, fees and expenses of estate administration, and after all distributions to beneficiaries as designated in the trust documents.

132. In seeking the cooperation of beneficiaries in removing attorney Glasgow and

having himself appointed as successor trustee, the respondent never contacted any of the charities.

133. On or about September 21, 2001, the respondent sent a letter to attorney Glasgow stating that attorney Glasgow had been removed as trustee of the Rohn trust and that the respondent had been appointed as successor trustee.

134. Shortly after declaring himself to be successor trustee of the Rohn trust, the respondent wrote and signed a check payable to himself drawn on Mr. Rohn's checking account at U.S. Bank. The check, dated October 12, 2001, was payable to the respondent in the amount of $12,319.50, and was for payment of the respondent's fees charged for representing Lora Larson from September 10, 2001 through October 10, 2001.

135. A portion of the time for which the respondent billed Ms. Larson and for which he paid himself from Mr. Rohn's account was spent researching and consulting with other attorneys concerning the respondent's own conflict of interest. Substantial additional time was billed by the respondent for time spent in his efforts to have himself appointed as successor trustee of the Rohn trust.

136. In seeking to have himself appointed as successor trustee of the Rohn trust, the respondent was acting for his own benefit and not for the benefit of his client, Ms. Larson, or for the trust.

137. Pursuant to Colo. RPC 1.7(b), a lawyer shall not represent a client if representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

138. The respondent continued to have an attorney-client relationship with Lora Larson at a time when his representation may have been materially limited by his responsibilities to the other beneficiaries of the Rohn trust and by the respondent's own interests.

139. The respondent's service as trustee of the Rohn trust may also have been materially limited by the respondent's responsibilities to Ms. Larson and by the respondent's own interests.

140. The respondent failed to explain the implications of the common representation and the advantages and risks involved.

141. Neither Lora Larson nor any of the other beneficiaries of the Rohn trust consented to the respondent's representation as described above after consultation, as required and as defined by Colo. RPC 1.7(b).

142. Through his conduct as described above, the respondent violated Colo. RPC 1.7(b).

WHEREFORE, the complainant prays at the conclusion hereof.

## CLAIM VII

### [Improper solicitation of professional employment—Colo. RPC 7.3(a) ]

143. Paragraphs 107 through 141 are incorporated herein as if fully set forth.

144. In seeking his own appointment as successor trustee of the Rohn trust, the respondent solicited professional employment from prospective clients.

145. The respondent solicited such professional employment through both in-person and live telephone contact with the prospective clients.

146. The respondent had no family or prior professional relationship with any of the beneficiaries of the Rohn trust, other than Lora Larson.

147. A significant motive for the respondent's solicitation of professional employment through appointment as successor trustee of the Rohn trust was his own pecuniary gain.

148. Through his conduct as described above, the respondent violated Colo. RPC 7.3(a) (a lawyer shall not either in-person or by live telephone contact, solicit professional employment from a prospective client with whom the lawyer has no family or prior professional relationship or a significant motive for the lawyer's doing so is the lawyer's pecuniary gain).

WHEREFORE, the complainant prays at the conclusion hereof.

## CLAIM VIII

**[Conduct involving dishonesty, fraud, deceit or misrepresentation, and violating or attempting to violate the Rules of Professional Conduct through the act of another—Colo. RPC 8.4(c) and Colo. 8.4(a) ]**

149. Paragraphs 107 through 147 are incorporated herein as if fully set forth.

150. In seeking nomination of himself as successor trustee of the Rohn trust, the respondent asked Beatrice Lobland, a beneficiary living in Minnesota, to sign a nomination form prepared by the respondent and return the form to the respondent.

151. After the respondent received the form signed by Ms. Lobland in Minnesota, the respondent asked a notary public in his office suite in Colorado to notarize Ms. Lobland's signature.

152. In asking the notary to notarize Ms. Lobland's signature, the respondent knew that neither he nor the notary had witnessed the signature, and had no way of knowing whether the signature was genuine. Despite this knowledge, the respondent advised the notary she was permitted to notarize the signature and requested that she do so.

153. The notary complied with the respondent's request and notarized Ms. Lobland's signature.

154. By notarizing Ms. Lobland's signature, the notary verified that Ms. Lobland had appeared and signed the document before the notary and that the notary was able to verify her identity. These representations were false.

155. The notary made such false representations based upon the advice and at the request of the respondent.

156. The respondent then published the document containing the false representations to others, including the probate court, intending that they rely upon the misrepresentations.

157. Through his own actions and the actions of the notary as described above, the respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation.

158. Through his conduct as described above, the respondent violated Colo. RPC 8.4(a) (it is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct through the act of another) and Colo. RPC 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation).

WHEREFORE, the complainant prays at the conclusion hereof.

## CLAIM IX

**[Conduct involving dishonesty, fraud, deceit or misrepresentation— Colo. RPC 8.4(c) ]**

159. Paragraphs 107 through 156 are incorporated herein as if fully set forth.

160. On September 21, 2001, when the respondent notified attorney Glasgow of attorney Glasgow's alleged removal as trustee of the Rohn trust, the respondent stated to attorney Glasgow, in a letter, that "my office has been retained by Lora Larson, as well as the majority of the beneficiaries of Mr. Rohn's revocable trust with respect to the administration of Mr. Rohn's trust and his estate."

161. The statement made by the respondent in his letter to attorney Glasgow was false in that the respondent had not been retained by any of the beneficiaries in their individual capacity other than Lora Larson. Furthermore, the respondent had not been retained by anyone with respect to administration of Mr. Rohn's estate. Rather, the respondent had obtained nominations from the majority of the beneficiaries of the Rohn trust for the respondent's appointment as successor trustee.

162. The letter from the respondent to attorney Glasgow was sent in an attempt to get attorney Glasgow to turn over to the respondent all trust and estate documents in attorney Glasgow's possession.

163. The representations made by the respondent in his letter to attorney Glasgow

were material and the respondent knew they were false.

164. The respondent intended for attorney Glasgow to rely upon the statements made in his September 21, 2001 letter in determining what action to take in regard to the trust and estate documents in attorney Glasgow's possession.

165. Also on September 21, 2001, the respondent sent a letter to Ms. Karen Barber, at U.S. Bank, concerning Mr. Rohn's bank account. In the letter, the respondent represented to U.S. Bank, "this office represents the beneficiaries of the Estate of John O. Rohn, including the majority of the beneficiaries of Mr. Rohn's living trust dated September 19, 1995 and amended August 9, 2001."

166. The above-referenced representations made by the respondent in his letter to U.S. Bank were false in that the respondent did not represent any of the beneficiaries of the Rohn estate or trust in their individual capacity, other than Ms. Larson.

167. The respondent's representations to U.S. Bank as described above were material and the respondent knew they were false.

168. The respondent intended for U.S. Bank to rely upon his misrepresentations in allowing the respondent access to Mr. Rohn's account at U.S. Bank.

169. US Bank reasonably relied upon the respondent's representations in honoring the check written by the respondent drawn on Mr. Rohn's account at U.S. Bank on October 12, 2001, pursuant to which the respondent paid himself $12,319.50.

170. At the time the respondent wrote and signed the check drawn on Mr. Rohn's account at U.S. Bank, the respondent was not an authorized signatory on the account and had taken no steps to sign any signature cards or other documents at U.S. Bank to become an authorized signatory on the account.

171. Prior to writing a check to himself from Mr. Rohn's account, the respondent had not obtained authorization from the court or from anyone other than himself to pay himself from Mr. Rohn's account the invoice for services he provided pursuant to his fee agreement with Ms. Larson.

172. In writing the letters to attorney Glasgow and to U.S. Bank as described above, the respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation.

173. The respondent engaged in a further act of dishonesty or deceit by taking advantage of his prior misconduct and misrepresentations to pay himself from Mr. Rohn's account at U.S. Bank for services he had performed pursuant to a fee agreement with Ms. Larson.

174. Through his conduct as described above, the respondent violated Colo. RPC 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation).

WHEREFORE, the complainant prays at the conclusion hereof.

## CLAIM X

### [Knowing failure to comply with a court order—Colo. RPC 3.4(c) ]

175. Paragraphs 107 through 173 are incorporated herein as if fully set forth.

176. In early October 2001, attorney Glasgow retained his own counsel and notified the respondent that he objected to the actions taken by the respondent in relation to the Rohn estate.

177. During the month of October, several of the beneficiaries who had signed forms to nominate the respondent as successor trustee of the Rohn trust retracted their nomination.

178. In late October 2001, attorney Glasgow filed a motion in the Arapahoe County District Court, Probate Division, seeking an emergency restraining order and/or preliminary injunction to restrain the respondent from acting as trustee for the Rohn trust.

179. On November 5, 2001, Judge Timothy L. Fasing entered an order granting the motion for preliminary injunction and requiring, among other things, that the respondent cease acting as or identifying himself as the successor trustee of the Rohn trust and requiring him to turn over to attorney Glasgow

any trust assets in his possession, and any documents in his possession relating to the Rohn trust.

180. Despite requests from attorney Glasgow and his counsel, the respondent failed or refused to disgorge funds he paid to himself from Mr. Rohn's bank account at U.S. Bank.

181. After the respondent's failure or refusal to pay the funds back to the trust, the trust made demands upon U.S. Bank based upon U.S. Bank's alleged failure to follow appropriate procedures in honoring the check.

182. US Bank agreed to and did restore the funds to the account. Thus, the trust has been made whole, except to the extent that it had to pay additional attorney fees to deal with U.S. Bank.

183. US Bank, however, has not been made whole as the respondent has failed or refused demands from U.S. Bank for contribution or reimbursement.

184. The funds the respondent paid to himself from Mr. Rohn's bank account were, at the time the respondent wrote the check to himself, assets of the Rohn estate or trust.

185. The assets of the Rohn estate and trust were subject to the jurisdiction of the probate division of the Arapahoe County District Court.

186. The respondent never obtained authorization from the Arapahoe County District Court or anyone else to pay himself any funds from the Rohn estate or trust assets.

187. Pursuant to Judge Fasing's order of November 5, 2001, the respondent was obligated to restore to the Rohn trust the funds he had paid to himself out of the trust assets.

188. The respondent received a copy of Judge Fasing's order and knew of his obligations pursuant to the order.

189. Through his conduct as described above, the respondent has knowingly failed to comply with Judge Fasing's order.

190. Through his conduct as described above, the respondent has violated Colo. RPC 3.4(c) (knowing failure to comply with an obligation under the Rules of a Tribunal).

WHEREFORE, the complainant prays at the conclusion hereof.

## CLAIM XI

### [Conversion of client or third party funds—Colo. RPC 8.4(c) ]

191. Paragraphs 107 through 188 are incorporated herein as if fully set forth.

192. The funds on deposit in Mr. Rohn's bank account at U.S. Bank as described above belonged to Mr. Rohn's estate or his trust. By using those assets to pay himself for work performed pursuant to a fee agreement with Ms. Larson, the respondent exercised unauthorized dominion or ownership over a portion of those funds.

193. At the time the respondent initially exercised dominion or ownership over the funds, the respondent knew or should have known that the funds belonged to the Rohn estate or to the Rohn trust, and that he did not have authorization to use the funds for his own purposes or to pay himself for services he had performed pursuant to a fee agreement with Ms. Larson.

194. To the extent the respondent believed initially, that he was acting as trustee of the Rohn trust and had authority to use a portion of Mr. Rohn's funds to pay himself in October 2001, Judge Fasing's order entered on November 5, 2001 made it clear that the respondent was not entitled to exercise dominion or control over any of Mr. Rohn's assets.

195. Since receiving a copy of Judge Fasing's order, the respondent has continued to exercise unauthorized dominion or ownership over assets belonging to the Rohn estate or trust.

196. Because of the settlement between the Rohn trust and U.S. Bank, however, any legal claim to such funds now belongs to U.S. Bank.

197. Through his conduct as described above, the respondent converted or misappropriated funds belonging to the Rohn estate or the Rohn trust.

198. The respondent's conversion of such funds was knowing.

199. Through his conversion of funds as described above, the respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation.

200. Through his conduct as described above, the respondent violated Colo. RPC 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation).

WHEREFORE, the people pray that the respondent be found to have engaged in misconduct under C.R.C.P. 251.5 and the Colorado Rules of Professional Conduct as specified above; that the respondent be appropriately disciplined for such misconduct; that the respondent be required to refund fees or pay restitution to the clients in the Caldwell Matter; that the respondent be required to pay appropriate restitution to U.S. Bank in relation to the Glasgow/Estate of Rohn Matter; and that the respondent be required to pay any restitution deemed appropriate in the trust account notification matter; and that the respondent be assessed the costs of this proceeding.