The PEOPLE of the State of Colorado, Complainant,

v.

Kirk Patterson BROWN, Respondent.

No. 06PDJ059.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

April 25, 2007.

## OPINION AND ORDER IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19

### I. *ISSUE/SUMMARY*

 Disbarment is generally appropriate, absent significant evidence of mitigation, when a lawyer knowingly converts or misapplies client funds and causes injury. Respondent took a total of approximately $18,000.00 from six separate clients, completed little or no work for them, and when they asked Respondent to return their money, he failed to do so. Is disbarment the appropriate sanction in this case?

The testimony and records the People presented show that Respondent used client funds as if they belonged to him without earning them. The People also presented substantial evidence in aggravation. Respondent failed to participate in these proceedings and failed to appear for the Sanctions Hearing or otherwise offer any evidence in mitigation. Based upon this record, the Court finds that Respondent misapplied client funds and that the presumptive sanction of disbarment is appropriate in this case.

*SANCTION IMPOSED:* **ATTORNEY DISBARRED**

### II. *PROCEDURAL HISTORY*[1]

On September 21, 2006, the People filed a complaint against Respondent. Respondent filed an answer on October 16, 2006. On January 19, 2007, the People filed a motion for summary judgment and Respondent never responded to this motion. Accordingly, the Court granted the People's motion for summary judgment as to each claim set forth in their complaint on February 17, 2007.

1. On September 11, 2006, the Colorado Supreme Court issued an order immediately suspending Respondent from the practice of law pursuant to C.R.C.P. 251.8(b)(2) upon consideration of the People's petition for immediate suspension, Respondent's answer, and this Court's report.

2. All references in footnotes to exhibits, unless otherwise referenced, are to exhibits the Court received at the immediate suspension hearing.

### III. *FINDINGS OF MATERIAL FACT*

The Hearing Board hereby adopts and incorporates by reference the Court's factual findings from the "Order Re: Motion for Summary Judgment" issued on February 17, 2007.[2]

Respondent has taken and subscribed the Oath of Admission, was admitted to the Bar of the Colorado Supreme Court on October 1, 1971, and is registered upon the official records, Attorney Registration No. 04510. Accordingly, Respondent is subject to the jurisdiction of this Court. C.R.C.P. 251.1(b).

#### *The Williams Matter*

In August 2004, Joan Williams retained Respondent to represent her in removing liens from the title to her home and a separate vacant lot, and paid him a check for $3,000.00.[3] Respondent did not provide Ms. Williams with a written fee agreement. Respondent told Ms. Williams that he would file a case by October 2004.

After not hearing from Respondent about her case, Ms. Williams attempted to contact him several times. On December 8, 2004, Ms. Williams sent a certified letter to Respondent in which she fired him, demanded that he return her file, and refund the money she paid him.[4] The next day, Respondent called Ms. Williams and told her that he was working on her case and that he had not received her earlier calls concerning the case.

On December 29, 2004, Respondent sent Ms. Williams a letter and asked what documents she wanted him to return. On March 3, 2005, Ms. Williams went to Respondent's office and again asked for her money and file back. Respondent could not find her file at the time, but told her he would mail it to her.

In March 2005, Ms. Williams agreed to let Respondent continue working on her case

3. *See* the People's Exhibit 18, a copy of the check from Joan (Johnson) Williams to Respondent.

4. *See* the People's Exhibit 21, certified letter from Joan Williams to Respondent dated December 8, 2004.

after she received assurances that he was working on it and that they would have a court date soon. From that point forward, Ms. Williams communicated with Respondent by certified mail.

On June 16, 2005, Respondent and Ms. Williams discussed the possibility of settling the case by tendering $5,000.00 to the lien holder, Ms. Williams husband's ex-wife. Ms. Williams rejected the potential settlement.

Respondent then told Ms. Williams that their court date had been set in August 2005. On November 23, 2005, Ms. Williams went to the Otero County Court, confirmed that Respondent had filed a case on her behalf in December 2004.

When Ms. Williams and her husband divorced in October 2005, Ms. Williams told Respondent that she did not want to proceed with the case on her behalf. On November 23, 2005, Ms. Williams again asked for her money back. On November 28, 2005, Respondent told Ms. Williams he would account for the fees he earned and send her a refund for funds he had not earned. On January 20, 2006, Ms. Williams again went to the Otero County Court and discovered that her case had been dismissed in August 2005 for failure to prosecute.[5]

Ms. Williams acknowledges that Respondent did legal work on her behalf but he failed to keep her informed about her case or refund her unearned money once she fired him.

### The Ashlock Matter

The parties stipulated at the immediate suspension hearing that the affidavit of James Ashlock be considered in lieu of his testimony.[6] On October 11, 2004, Mr. Ashlock hired Respondent in a "potential discrimination or harassment lawsuit" against the Department of Corrections. Respondent told Mr. Ashlock that he would need $3,000.00 to start the case. Approximately one week later, Mr. Ashlock gave Respondent $3,000.00. Respondent gave Mr. Ashlock a receipt for the funds on the back of one of Respondent's business cards. However, Respondent did not provide Mr. Ashlock with a written fee agreement. Thereafter, Mr. Ashlock gave Respondent his original employment documents from the Department of Corrections as well as a potential list of witnesses who might assist in his case.

On February 8, 2005, the Department of Corrections terminated Mr. Ashlock's employment. Upon his termination, Mr. Ashlock tried to contact Respondent but received no return calls. In April of 2005, Mr. Ashlock moved to Arizona. After doing so, Mr. Ashlock received a letter from the Department of Corrections indicating that he was terminated but without disciplinary action being taken against him.

With this disclosure from the Department of Corrections, Mr. Ashlock decided that he no longer wanted to pursue an action against the Colorado Department of Corrections. However, Mr. Ashlock did not notify Respondent until December 2005 that he no longer wanted to pursue the case against the Department of Corrections. Mr. Ashlock also told Respondent that he wanted an itemized bill for the services provided. Respondent told Mr. Ashlock that he would provide an accounting as well as his file, but never did notwithstanding Mr. Ashlock's numerous requests.

### The Pantello Matter

In January 2005, Karen Pantello met Respondent at his office and described to him what she considered to be an unlawful termination by her former employer.[7] She felt that she had been forced to resign. Ms. Pantello testified that Respondent told her that he thought she had a good case of "abusive management." She therefore paid Respondent $5,000.00 at his request *for the purpose of hiring an economist,* although the check memo says it is for "attorney fees." [8]

---

5. *See* People's Exhibit 19, certified copy of the court file from the Otero County District Court.

6. *See* People's Exhibit 34, Affidavit of James Ashlock.

7. *See* Respondent's Exhibit A, Affidavit of Karen Pantello.

8. *See* Respondent's Exhibit B, a copy of the check from Karen Pantello to Respondent.

Respondent did not provide Ms. Pantello with a written fee agreement but she understood that he would represent her on a contingency fee basis.

Respondent told Ms. Pantello that he would draw up a complaint and file the matter in district court. In the meantime, Respondent worked on her case and drafted a complaint. He later tried to mediate the claims against the former employer. In April 2005, Ms. Pantello asked Respondent to drop the suit because she was concerned about the impact her lawsuit might have on her new employer.

In January 2006, Ms. Pantello went to Respondent's office and knocked on the door, but Respondent did not come to the door for forty-five minutes. When he did, Respondent told Ms. Pantello he had to leave for a court appearance and asked her to come back the next day. When she returned the next day, Respondent advised Ms. Pantello that he had not resolved her matter in mediation due to a scheduling problem. Respondent did not identify the lawyers with whom he was dealing, but said they were from Denver.

Respondent told Ms. Pantello that the attorneys representing her former employer offered $1,500.00 to settle but he rejected the offer. She then expected Respondent to file a complaint. Thereafter, Ms. Pantello tried numerous times to contact Respondent and left messages but he would not return her calls. By April 2006, she had decided that she wanted her file back and a refund of money she had tendered Respondent.

When she could not reach Respondent she sought the assistance of another lawyer, Douglas Gradisar. On April 13, 2006, Mr. Gradisar sent Respondent a letter demanding Respondent provide Ms. Pantello a full and complete accounting of the $5,000.00 she had delivered to Respondent.

On June 26, 2006, Mr. Gradisar sent Respondent a second letter acknowledging that someone from Mr. Gradisar's office had picked up Ms. Pantello's file from Respondent's office and retrieved a check from Respondent in the amount of $2,000.00 ($5,000.00 minus $3,000.00 allegedly paid to an economist). However, Mr. Gradisar found nothing in Ms. Kirby's file to support Respondent's claim that he had paid an economist $3,000.00. Thus, Mr. Gradisar asked Respondent for the name and address of the economist he claimed to have paid to assist in Ms. Kirby's case. Respondent never provided the name or otherwise account for the funds he maintained.

### The Kirby Matter

Deanna Kirby contacted Respondent in February 2005. Ms. Kirby's former employer terminated her a month earlier after she took family medical leave. Respondent asked Ms. Kirby to give him $5,000.00 for expenses and told her he thought she had a good case. On February 8, 2005, Respondent presented a written contingency agreement, which provided that he would receive 33% of the net amount collected from a lawsuit against Ms. Kirby's former employer.[9] Ms. Kirby tendered Respondent a check for $5,000.00 on or about February 8, 2005.[10]

Respondent advised Ms. Kirby that he would file a claim with EEOC and later said that the case was in mediation. However, when Ms. Kirby checked with the EEOC, she could not confirm that Respondent had filed a claim on her behalf. In October 2005, Ms. Kirby contacted another attorney, Joe Losavio, to act on her behalf.

On October 31, 2005, Mr. Losavio sent a letter to Respondent asking him to confirm that he had filed a case with the EEOC or the Colorado Civil Rights Commission on behalf of Ms. Kirby. Mr. Losavio also asked Respondent to provide a full accounting for all of the expenses he had incurred as well as a statement of the services Respondent had provided to Ms. Kirby.

Respondent wrote to Ms. Kirby that he had undergone throat surgery and his office administrator also had some significant medical problems, but that he was going to file

---

**9.** *See* People's Exhibit 13, Contingent Fee Agreement.

**10.** *See* People's Exhibit 14, a copy of the check from Deanna Kirby to Respondent.

Respondent's case in the federal courts.[11] Ms. Kirby decided to continue working with Respondent based on his assurances that he would be working on her case. On June 20, 2005, Ms. Kirby sent Respondent an e-mail message and asked him if he was working on extending her COBRA coverage, a matter related to lawsuit against her former employer.[12] Thereafter, Ms. Kirby did not hear from Respondent.

On July 7, 2006, Ms. Kirby wrote Respondent and terminated his professional services, asked for her file, and once again requested a refund of her $5,000.00.[13] Up to that point in time she had not seen any work product from Respondent or an accounting for the $5,000.00 she tendered to him for expenses of the lawsuit on February 8, 2005. Ms. Kirby testified that Respondent told her that the money had already been spent on "an investigator or an economist."

### The Krol Matter

The parties stipulated that the affidavit of Mitchell Krol, Jr. be considered in lieu of his testimony.[14] Mr. Krol retained Respondent in August 2005 to assist him in obtaining a clear title on a lot Mr. Krol purchased in Colorado City, Colorado. Mr. Krol lives in Oregon and found Respondent's name through the Pueblo Chamber of Commerce. Mr. Krol's only contact with Respondent was via telephone.

Respondent advised Mr. Krol that his fee would be $750.00 to quiet title to the lot Mr. Krol purchased. Respondent did not present Mr. Krol with a fee agreement, but Mr. Krol sent Respondent $750.00 as requested in the later part of August 2005.

Thereafter, Respondent told Mr. Krol that he had filed an action on his behalf. Mr. Krol, however, discovered that notice had not been sent to the necessary parties to the quiet title action. When he advised Respondent of this, Respondent seemed to be confused.

In January 2006, after failing to confirm that Respondent had taken any action on his behalf, Mr. Krol contacted the People and reported Respondent's failure to act. On January 17, 2006, Respondent contacted Mr. Krol and asked Mr. Krol if he wanted a refund or preferred that Respondent continue working on his case. Based upon Respondent's assurances that he would continue to work on the case, Mr. Krol agreed to continue Respondent's services.

After reaching this accord, Respondent did not return Mr. Krol's numerous calls. Mr. Krol asked a friend to check the records in the Pueblo District Court. He discovered that Respondent had filed an action on his behalf in February 2005, but the matter had been dismissed because the check Respondent tendered for the filing fee was returned for insufficient funds. After learning that Respondent had not completed any action on his behalf, Mr. Krol again asked for a refund of the money he provided Respondent. Respondent has failed, however, to do so.

### The Stevens Matter

Carol Stevens first met with Respondent on February 13, 2006 to discuss how she and her husband could clear title to a modular home they purchased in a foreclosure sale. On February 17, 2006, she paid money Respondent requested for a retainer in the amount of $750.00.[15] Respondent told Ms. Stevens it would only take a week to resolve her problem. Ms. Stevens later delivered to Respondent original documents, including the original title to the house.

Thereafter, Ms. Stevens tried numerous times to contact Respondent without success.[16] In April 2006, she sent a certified

---

11. *See* People's Exhibit 24, e-mail exchange between Deanna Kirby and Respondent.

12. *See* People's Exhibit 15, a copy of the e-mail message from Deanna Kirby to Respondent.

13. *See* People's Exhibit 16, letter from Deanna Kirby to Respondent dated July 7, 2006.

14. *See* People's Exhibits 33 and 36, Affidavit (and Supplement) of Mitchell Krol, Jr.

15. *See* People's Exhibit 8, a copy of the check from Carol Stevens to Respondent.

16. *See* People's Exhibit 10, a copy of a note left by Carol Stevens at Respondent's office dated April 28, 2006.

letter to Respondent.[17] In May 2006, Ms. Stevens sent a second registered letter to Respondent and requested an accounting of the time he spent on her case and a refund of and unearned funds. Respondent never answered this letter. Ms. Stevens' new lawyer resolved the title matter in two weeks.

### The People's Bank Records Investigation

Karen L. Bershenyi, an investigator for the People, subpoenaed Respondent's COLTAF account records from July 1, 2004 through June 2006.[18] In her review of Respondent's bank records, Ms. Bershenyi found the following:

1. None of the funds Ms. Williams, Mr. Ashlock, Ms. Pantello, Ms. Kirby, Mr. Krol or Ms. Stevens were placed into Respondent's COLTAF account.

2. The checks Ms. Williams, Ms. Pantello, Ms. Stevens and Ms. Kirby paid to Respondent were deposited into Respondent's operating account at U.S. Bank.

3. The checks Mr. Ashlock and Mr. Krol paid to Respondent were deposited into Respondent's operating account at U.S. Bank.

4. Bank records show Respondent paid for personal expenses including restaurants, groceries, entertainment, personal travel, gasoline and other personal expenses from the operating account mentioned above.

Approximately one month before the immediate suspension hearing in this matter, Respondent offered to refund all the money he received from the six clients discussed above. The parties stipulated to the fact that on August 24, 2006, Respondent delivered a check in the amount of $18,000.00 to the People for the purpose of fully refunding the clients listed above.

### IV. CONCLUSIONS OF LAW— SUBSTANTIVE ALLEGATIONS

By virtue of this Court's order granting the People's motion for summary judgment, the People have established the material facts stated above as well as the rule violations contained in Claims 1–12.

### V. SANCTIONS

The ABA Standards for Imposing Lawyer Sanctions (1991 & Supp.1992) ("ABA Standards") and Colorado Supreme Court case law are the guiding authorities for selecting and imposing sanctions for lawyer misconduct. *In re Roose*, 69 P.3d 43, 46–47 (Colo.2003). In imposing a sanction after a finding of lawyer misconduct, the Hearing Board must first consider the duty breached, the mental state of the lawyer, the injury or potential injury caused, and the aggravating and mitigating evidence pursuant to ABA *Standard* 3.0.

Respondent's failure to participate in the Sanctions Hearing leaves the Hearing Board with no alternative but to consider only the established facts and rule violations in evaluating the factors listed above.

### Duties Breached

The Hearing Board finds Respondent violated duties owed to his clients, the public, and the legal system. Respondent specifically violated his duty to preserve the property of his clients and failed to maintain his personal integrity.

### State of Mind

Respondent acted knowingly, that is, he was aware of his conduct when he failed to properly manage client funds from six separate clients.

### Injury

While monetary loss to Respondent's six clients was significant, the emotional injury to them is equally present here. The evidence shows that Respondent lied to his clients about the legal actions he took on their behalf and the disposition of the funds they entrusted to him.

---

17. *See* People's Exhibits 9 and 11, return receipt and certified letter from Carol Stevens to Respondent dated April 12, 2006.

18. *See* People's Exhibit 35, Affidavit of Karen L. Bershenyi and People's Exhibit 1, COLTAF account records from Canon National Bank.

### Aggravating Factors ABA Standard 9.22

The Hearing Board finds several aggravating factors exist including dishonest or selfish conduct, a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of his conduct, vulnerable victims, and substantial experience in the practice of law. *See* ABA *Standards* 9.22(b), (c), (d), (g), (h), and (i). Due in part to the absence of any contradictory evidence, the Hearing Board finds clear and convincing evidence to support each aggravating factor.

### Mitigating Factors ABA Standard 9.32

Respondent presented no evidence in mitigation. However, the Hearing Board considered the absence of a prior disciplinary record over thirty-five years of practicing law and the fact that although Respondent paid restitution late in these proceedings, such action should be considered in determining the appropriate sanction. *See* ABA *Standards* 9.32(a) and (d).

### Analysis of Aggravating and Mitigating Factors

The ABA *Standards* suggest that the presumptive sanction for the misconduct evidenced by the admitted facts and rule violations in this case is disbarment. Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client. ABA *Standard* 4.11. The undisputed facts show Respondent knowingly took a total of approximately $18,000.00 from six separate clients, completed little or no work for them, and failed to return their money.

■ Knowing *conversion or misappropriation* of client money "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *People v. Varallo,* 913 P.2d 1, 11 (Colo.1996). (Emphasis added). Neither the lawyer's motive in taking the money, nor the lawyer's intent regarding whether the deprivation is temporary or permanent, are relevant for disciplinary purposes. *Id.* at 10–11. Significant mitigating factors may overcome the presumption of disbarment, however, none are presented in this case. *See In re Fischer,* 89 P.3d 817 (Colo.2004) (finding significant facts in mitigation).

■ The Hearing Board considered the fact that Respondent paid restitution to his clients and also considered the timing of the restitution, which occurred during the second day of the hearing for immediate suspension. The Hearing Board finds that this restitution was not timely made and is more akin to a "forced or compelled" restitution, a factor which should not be considered as either aggravating or mitigating when determining the appropriate sanction. *See* ABA *Standard* 9.4(a).

Respondent's conversion of client funds warrants disbarment. His failure to participate in the Sanctions Hearing further precludes any deviation from the presumptive sanction.

### VI. CONCLUSION

One of the primary goals of our disciplinary system is to protect the public from lawyers who pose a danger to it. The facts established in the complaint, the serious breach of a fiduciary duty, Respondent's knowing state of mind, serious injury, and the numerous factors in aggravation, reveal the serious danger Respondent poses to the public. The undisputed facts show that he converted client funds and such misconduct adversely reflects on his fitness to practice law. Upon consideration of the ABA *Standards* and Colorado Supreme Court case law, the Hearing Board concludes there is no justification for a sanction short of disbarment.

### VII. ORDER

The Hearing Board therefore **ORDERS:**

1. **KIRK PATTERSON BROWN,** Attorney Registration No. 04510, is **DISBARRED** from the practice of law, effective thirty-one (31) days from the date of this order, and his name shall be stricken from the list of attorneys licensed to practice law in the State of Colorado.

2. **KIRK PATTERSON BROWN** shall pay the costs of these proceedings. The People shall submit a Statement of Costs within fifteen (15) days of the date of this order. Respondent shall have ten (10) days within which to respond.